## H. A. Metz Laboratories, Inc., Plaintiff, *v.* Jacob Blackman and Others, Defendants.

Supreme Court, New York County, October 8, 1934.

*Boehm & Zeiger, Edward S. Rogers* and *James F. Hoge* [*Louis Boehm* and *David Rasch* of counsel], for the plaintiff.

*Morris Kirschstein* [*Nathan Burkan, Louis Froelich* and *Morris Kirschstein,* of counsel], for the defendants.

COTILLO, J. This is an action for an injunction to restrain a trade-mark infringement and unfair competition and also for an accounting. The following allegations are contained in the complaint:

Plaintiff and its predecessors for the past thirty-six years have been selling a certain drug known in the pharmacopœia as amidopyrine, and used for the treatment and alleviation of headache, neuralgia, colds, influenza, rheumatism and other ailments, under the trade-mark " Pyramidon." Said trade-mark was duly registered in the United States Patent Office under registration number 32214 in the year 1898 and in the year 1907 under the number 65177, and under the number 228308 in the year 1927. The trade-mark was and is applied to the product of the plaintiff and its predecessors by being printed upon labels pink in color and attached to the tubes, bottles

and boxes in which the product is sold, and also upon cartons and packages in which the bottles and tubes are contained, and this trade-mark is also used in advertising literature and circulars. This pink label has been used in order to identify the plaintiff's product and that the drug trade, physicians, dentists and the public have come to know and identify plaintiff's brand of amidopyrine by this label. By reason of the superior brand of amidopyrine sold by the plaintiff and its predecessors under their trade-mark of " Pyramidon " used in the tubes and boxes bearing the pink label, and by reason of the expenditure of large sums of money for advertising, the drug trade and medical and dental professions in addition to the general public have come to highly regard such product, and the sale of plaintiff's product has grown to very substantial proportions.

The plaintiff charges that the defendants, knowing full well the plaintiff's exclusive right to the trade-mark " Pyramidon " and to the pink label used by the plaintiff in connection with the sale of its brand of amidopyrine and of the national sale of " Pyramidon " built up by the plaintiff by the use of the pink label and by the extensive advertising, and also knowing that the trade-mark and the pink label serve to identify the product of the plaintiff, and desiring to obtain for themselves the benefits and advantages of the plaintiff's trade-mark and pink label and the advertising conducted by the plaintiff, and in violation of the plaintiff's exclusive right to the trade-mark and pink label, commenced to sell and are now selling amidopyrine which is not the product of the plaintiff, and are doing so in boxes and tubes with the pink label and under the name " Pyramidon." Defendants have placed their product in tubes of the same size and shape as the tubes used by the plaintiff for its " Pyramidon " and inclosed said tubes in cartons likewise similar to those of the plaintiff, and in a deliberate and designed imitation of plaintiff's get-up and color scheme, have made their cartons and labels designed in pink. This was done to deceive the public into buying defendants' amidopyrine under the impression that it was the product of the plaintiff.

The defendants admit that the term " Pyramidon " was registered, but claim that the word " Pyramidon " is the name of a certain drug or compound which was patented in the United States under United States letters patent No. 579412 and said name " Pyramidon " was applied to the said compound by plaintiff's alleged predecessors during the life of said patent and is the name by which said compound has been designed, known and applied to the public ever since its introduction, and has in fact become the generic name of the compound. That on or about the 23d day of March, 1914, the said United States letters patent No.

174

579412 expired and the said compound, as well as the generic name "Pyramidon" applied thereto, became public property and thereafter any one had a right to manufacture and sell said compound and to apply thereto the said generic name "Pyramidon," and subsequent to the expiration of said letters patent the said compound was and has been extensively manufactured and sold by numerous manufacturers other than the plaintiff and plaintiff's predecessors in the United States, and that such other manufacturers manufactured and sold the compound under the name of "Pyramidon" and that the term "Pyramidon" is not a valid trade-mark and that the plaintiff has no exclusive rights therein. It is further claimed by the defendants that the alleged registration of the name "Pyramidon" by the plaintiff is null and void and of no effect, since it does not come within the scope of the provisions of the Trade-mark Act of 1905 (33 U. S. Stat. at Large, 724 *et seq.*), in that the name "Pyramidon" at the time of the alleged registration and ever since March, 1914, was and now is public property, being the name or designation of a pharmaceutical product in common public use since March 23, 1914, the patent on which product has thus expired and which name "Pyramidon" at the time of such registration was a generic or descriptive designation or name of a product, in which name no exclusive rights existed since that date. It is also claimed that the alleged registration was obtained by false statements by the plaintiff that it had the exclusive right to the name.

As a further defense the defendants claim that Farbwerke Vormals, Meister, Lucius & Bruning, a joint stock company organized under the laws of Germany, in or about the year 1896, manufactured for sale in the United States a certain medicine or remedy against fever, rheumatism and neuralgia, under the name "Pyramidon," and originated the said trade-mark and first adopted and used the same in the United States. On December 6, 1898, the German company registered the name "Pyramidon" in the United States Patent Office under the number 32214 and thereafter on September 10, 1907, under the number 65177 registered it again. On October 6, 1917, the act of Congress known as "Trading with the Enemy Act" (Chap. 106, 40 Stat. 411) was approved and became a law. This act was amended by the act of March 28, 1918 (Chap. 28, 40 Stat. 460) and act of November 4, 1918 (Chap. 201, 40 Stat. 1020). Pursuant to such acts the office of Alien Property Custodian was created and said Alien Property Custodian was authorized to demand and seize the property of alien enemies and to hold, administer and dispose of the same. Said acts of Congress authorized and required the

seizure by said Alien Property Custodian of said registrations numbered 32214 and 65177 and all rights thereunder and of the good will of the business connected therewith, including any property right to the word " Pyramidon " belonging to the Farbwerke Company as alien enemies. Under the above acts the Alien Property Custodian was authorized to sell at public action all seized alien enemy property. At the time of the enactment of these acts the plaintiff acted as agent for the Farbwerke Company. The Alien Property Custodian demanded and seized the registrations Nos. 32214 and 65177, and the business connected therewith, and all rights under said trade-marks and the good will of such business, and gave notice of such seizure to the plaintiff and also to the Commissioner of Patents, which notice of seizure was executed April 4, 1919, and was recorded in the United States Patent Office on April 8, 1919, in liber 106, page 390, Assignment of Patents and Trade-marks. In the month of February, 1919, a corporation known as the Chemical Foundation, Inc., was duly organized and its charter provided that it should hold any property, including letters patent and trade-marks rights or registrations granted in and by the United States, transferred to it by the Alien Property Custodian, pursuant to the acts of Congress and executive orders of the President of the United States in a fiduciary capacity, for the benefit of American industries and the advancement of chemical and allied sciences and industries in the United States and was obligated to grant non-exclusive licenses upon reasonable and equal terms and without advantage to citizens and corporations of the United States. Under the authority granted to him the Alien Property Custodian thereafter sold and transferred to the Chemical Foundation the registrations numbered 32214 and 65177, and all rights thereunder, including the good will of the business con-- nected therewith, in trust for the people of the United States and the benefit of American industries and the advancement of chemical and allied sciences and industry of the United States. The instru- ment whereby the transfer was effected was duly recorded in the United States Patent Office on April 21, 1919, in liber 107, page 1. That the Chemical Foundation ever since has been and now is the record owner of said trade-marks and the good will appurtenant. The Trading with the Enemy Act provided that any person or corporation not an enemy or ally of any enemy claiming any interest, right or title in and to any trade-marks and the business and good will of any registrant appurtenant thereto, seized and held by the Alien Property Custodian, might file a notice of claim therefor with said Alien Property Custodian and institute a suit in equity to enforce said claim; but no claim was filed by either the plaintiff

or its predecessors. From these allegations defendants draw the inference that Chemical Foundation is the real owner of the trademark, and whatever exclusive rights plaintiff possessed it lost.

It is alleged as a further defense that in the early part of 1929 the defendant Blackman & Blackman, Inc., had been manufacturing and selling " Pyramidon " and used the name therewith on a pink label, and the plaintiff, claiming an exclusive right to the word " Pyramidon," made demand that Blackman & Blackman, Inc., cease using the name. Thereupon negotiations ensued and a settlement of the controversy was consummated. This agreement provided for the plaintiff's exclusive use of the name " Pyramidon," the defendant Blackman & Blackman, Inc., to remain undisturbed in its use of the pink label. That defendant Blackman & Blackman, Inc., has since used this label with the full knowledge and written consent of the plaintiff, by reason of which plaintiff is estopped from preventing such further use.

Plaintiff has presented a strong *prima facie* case, and unless defendants can support their affirmative defenses there must be a decree in favor of plaintiff. These defenses, while they do not challenge plaintiff's right to the use of the name " Pyramidon," assert an equal right in defendants, on the alleged ground that the name is not the exclusive property of the plaintiff and that it is incapable of being the subject of a trade-mark because of its generic nature. Consequently, it is argued, it cannot be made the subject of exclusive appropriation. A special defense deals with the subject of the claim of unfair competition by reason of the imitation of plaintiff's label, that defense being based upon an alleged agreement, either express or implied, by which defendants were permitted to use it. I shall now proceed to weigh the merits of these defenses.

The defendants strenuously argue that " Pyramidon " is a generic name which was associated with the patented product, and when the patent expired the monopoly upon the name ceased. Two distinct arguments are really contained in this contention. The first is that " pyramidon " is a generic name, so understood by the public, for a chemical product manufactured by plaintiffs, and since they have no monopoly in the manufacture of such a combination, the name itself can be employed by any one who manufactures the same chemical product. In order to sustain this contention resort is had to the dictionary, defendants pointing to a definition of the term in the 1927 edition of the Standard Dictionary, where it is referred to as: " A crystalline compound * * * obtained by treating amidoantipyrin with methyliodid, methyl alcohol, and caustic potash; dimethylamido antipyrin; amidopyrin." The last word in this definition is the synonym, and the evidence shows

that this is really the generic term for the compound manufactured by the plaintiff. But the presence of the word in the dictionary is not at all a conclusive index of its generic nature. Trade names for popular products, as used by one manufacturer, may become so widely known as sometimes to be used as a synonym for the generic name itself. Striking examples of this are such names as " Kodak " and " Vaseline." Both these are defined in the dictionary and yet they are trade-marks, the use of which by any one outside the firms which have originated them would constitute an infringement. The fact that a large part of the public may associate a trade name with the generic name for a product is a tribute to the skill with which the firm has popularized the name. To put a penalty upon such skill and to say that the generalization of the trade name by the public as a result of the originator's publicity must deprive him of his monopoly in the name would, in the absence of special circumstances, be the height of injustice.

The second phase of that argument is based upon the general principle that when a patented article has been given a distinctive name for which there is no equivalent, the expiration of the patent destroys the monoply in the name itself. It may be true, for example, that after the patent for the telephone expired the name " telephone " as a generic name for the invention became public property. But if that name had been used as a distinctive trade-mark of the concern using the patent the situation might have been different, and the right to the use of the name would have survived the expiration of the patent, especially where an adequate synonym existed for it. A more striking illustration perhaps is the word " kerosene." Originally used as an arbitrary trade name in connection with an illuminating oil from petroleum (*Bennett* v. *North British, etc., Ins. Co.*, 81 N. Y. 273, 275), it has ceased to be used as a proprietary trade-mark and has become common property. It is now treated as a generic term.

There is no evidence here that the word " Pyramidon " is the generic name for the product; on the contrary, "Amidopyrin " is such generic name. The very fact that most manufacturers, with the exception of a few infringers, use that name and not " Pyramidon," is itself evidence of the special significance of the name " Pyramidon " as peculiarly associated with plaintiff's product. Strangely enough, defendants themselves have recognized that "Amidopyrin " was the generic name for the product, but they have put in parenthesis the expression " Pyramidon Equivalent." In this way they have been guilty of this curious contraction: The expression " Pyramidon Equivalent " would logically indicate that " Pyramidon " is the generic name and "Amidopyrin " is the

special variety sold by the defendants. The facts, however, are quite the reverse. Why then should defendants use the phrase " Pyramidon Equivalent," except as a source of confusion and as an excuse for substitution of its product for the original pyramidon when that is demanded by a customer? (*Winthrop Chemical Co.* v. *Blackman*, 150 Misc. 229.)

The second line of defense deals with a dispute of plaintiff's exclusive ownership of the trade-mark. The latter, as already pointed out in the summary of the defenses, is said to be owned by Chemical Foundation. Plaintiff's registration of 1927 is said to be of no effect in view of Chemical Foundation's prior ownership. It is significant that at the time of the 1927 application Chemical Foundation appeared in opposition, subsequently, however, abandoning its opposition so that the trade-mark registration was granted the plaintiff. With virtual disclaimer of title by the Chemical Foundation it is difficult to explain defendants' stand that title is in the Chemical Foundation, whether the latter recognizes that fact or not. Surely that corporation was competent to abandon any trade-mark which it possessed, in the same manner as any other corporation.

But as a matter of fact, neither the Alien Property Custodian nor the Chemical Foundation acquired more than a potential or inchoate right, in the absence of seizure of the business, of the good will of which the trade-mark was the symbol. The Alien Property Custodian acquired no property right in the trade-mark " Pyramidon " *per se*, and having no right, he could assign none to the Chemical Foundation. It is unnecessary to dilate upon the well-known distinction between a patent right which remains alive, regardless of its use, and a trade-mark which dies for want of a business in which to root it. As Hopkins (Trade Marks [4th ed.], p. 277) sums it up: " There can, finally, be no right in or to a trademark apart from its use. ' The mere sale of a trademark apart from the business in which it has been used confers no right of ownership, because no one can claim the right to sell his goods as goods manufactured by another. To permit this to be done would be a fraud upon the public (*Witthaus* v. *Mattfeldt & Co.*, 44 Md. 303).' To quote from a New York court (*Weston* v. *Ketcham*, 51 How. Pr. 455): ' There is no such thing as a trademark in " gross," to use that term by analogy. It must be " appendant " of some particular business in which it is actually used upon, or in regard to specified articles.' " And section 10 of the United States Trade-Mark Act (U. S. Code, tit. 15, § 90) provides for an assignment of a registered trade-mark in connection with the good will of the business in which the mark is used. This section

has been interpreted to make an assignment of a trade-mark without the transfer of the business as of no effect. (*Eiseman* v. *Schiffer*, 157 Fed. 473.)

No one but the plaintiff, therefore, has had the exclusive right to the use of the trade-mark "Pyramidon," since the acquisition by plaintiff of the business. This right has existed independent of any registration in the United States Patent Office. Even if no application for registration had been made, defendants' use of the name would have constituted an infringement upon plaintiff's common-law rights, or, in the very least, it would have constituted unfair competition. The defense, based upon lack of title in the plaintiff, is without merit and must be overruled.

Finally, we must consider the defense to the charge that defendants are imitating plaintiff's pink label. The fundamental contention is that plaintiff cannot legally claim a monopoly in a plain color of package, even though defendants would concede, *arguendo*, that plaintiff might obtain a proprietary right in a color combination. The argument is based upon false premises. Where the use of a certain color scheme has been restrained the reason was not because the complaining party had a monopoly in such scheme, but because the combination was liable to deceive the ultimate consumer by making him believe that what he was buying was the product of another. The adoption of a color in connection with a package, or tube, the size and shape of which are substantially identical with those of plaintiff, constitutes a deception here. Conceivably a different size and shaped package with the same pink label might not have that effect. As is said in *Chesebrough Mfg. Co.* v. *Old Gold Chemical Co.* (70 F. [2d] 383), a case cited by both parties, it is not enough that the defendant placed on its article distinguishing marks by which it could be identified by a careful and discriminating purchaser. It is the casual or ordinary purchaser who must be protected, and as to him the test is general appearance. In *Florence Mfg. Co.* v. *Dowd & Co.* (178 Fed. 73) the court said: "The law has a three-fold object: *First*, to protect the honest trader in the business which fairly belongs to him; *Second*, to punish the dishonest trader who is taking his competitor's business away by unfair means; and *third*, to protect the public from deception. * * * It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe which is before him symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail

to distinguish between them. The law is not made for the protection of experts, but for the public — that vast multitude which includes the ignorant, the unthinking, and the credulous, who, in making purchases,. do not stop to analyze. but are governed by appearances and general impressions."

The situation in the present case is somewhat similar to that in *Florence Mfg. Co.* v. *Dowd & Co. (supra)* where it was said:

" There are facts in the record upon which a plausible argument can be founded that the defendant deliberately intended to simulate the complainant's marks, boxes and labels for the purpose of securing a portion of its trade in brushes."

The evidence before me clearly indicates that labels containing plaintiff's trade-mark " Pyramidon " were pasted and used by the defendants on their product, and that the use by defendants of the pink label is not accidental but deliberately chosen to facilitate substitution of their product in place of plaintiff's without arousing the suspicion of the ultimate consumer. Else it is difficult to explain why of more than 300 products manufactured or put out by defendants the article, which is the subject of this litigation, is the only one sold with a pink label.

Having come to the conclusion that the pink label on the particular size and form of package constitutes unfair competition, we must now examine the affirmative defenses of laches and acquiescence. This defense is founded upon the fact that in 1929, when plaintiff's representative made an arrangement with some of the defendants not to use the name " Pyramidon," nothing was said about the pink label. No inference of an estoppel can be drawn from these facts. If there were laches on the part of plaintiff in not taking steps to stop the infringement before 1932, that fact does not disentitle plaintiff to an injunction. The failure to assert its rights would only bear on the question of an accounting. (*McLean* v. *Fleming,* 96 U. S. 245; *Menendez* v. *Holt,* 128 id. 514.) Nothing short of an element of estoppel, which would render it inequitable to deprive defendants of their right to use the pink label, would bar plaintiff from an injunction, and no such element exists here. The defendants have not substantiated their claim that the plaintiff agreed to permit the use of the pink label. Even if such an agreement existed, to be binding it must be based upon consideration. The mere promise of the defendants to refrain from doing something that they could not legally do is no consideration. The most that can be said in accordance with the foregoing authorities is that plaintiff granted defendants a revocable license which it had the privilege to withdraw at any time. However, the record in the opinion of the court clearly exonerates the plaintiff of any charge of laches.

Plaintiff obviously cannot be charged with laches if it had no knowledge of the defendants' deceptive use of the pink label prior to the latter part of 1931.

" Knowledge of infringement must be shown in order to establish laches or acquiescence; long infringement, if unknown to plaintiff, is no defense to an injunction, or recovery of damages and profits." (63 C. J. 528.)

Plaintiff was not obligated to search out and discover defendants' unfair competition. As was said in *Layton Pure Food Co.* v. *Church & Dwight Co.* (182 Fed. 24): " The legal presumption was that other manufacturers and dealers would respect that right. Upon that presumption the complainant had the right to rely, and its failure to search out and discover infringements constituted no lack of reasonable diligence."

Even if plaintiff had had knowledge prior to 1931 of the defendants' deceptive use of the pink label plaintiff was not obligated to institute suit until it had obtained evidence that the defendants' conduct was in fact injuring its business. As was said in *Lammes* v. *Ward Brothers Co., Inc.* (134 Misc. 288; affd., 227 App. Div. 840), where the defendant was enjoined from using plaintiff's trade-mark " Certified " as a name for bread: " The facts are that the term ' Certified ' as applied to bread was first employed by plaintiff's intestate; that defendant was notified of his claim to the exclusive use of the term in 1923, and knew of its use before that time, and that, in disregard of the claim of the plaintiff and her intestate, it has continued to use the term. It took the chance of its continued use, and, under these circumstances, the legal rights of the parties should be determined without regard to what the defendant did in the way of expenditures after it knew of the claim of the plaintiff's intestate. It was not unreasonable for the plaintiff's intestate to delay suit until after he had determined whether or not the use of the term by defendant would affect his business. The evidence shows that his sales diminished from the time that the term was employed by the defendant, until plaintiff's intestate was obliged to discontinue the sale of bread at wholesale to dealers, and to confine the sale of it to the retail trade. This did not occur until 1926 and suit was brought the same year, so that there was no laches."

Before the doctrine of laches will be applied, there must exist more than the mere lapse of time. There must appear elements of estoppel, whereby defendants are hurt through the delay to sue. (*Standard Oil Co.* v. *Michie*, 34 F. [2d] 802, 804.) Defendants have made no such showing. Certainly they cannot claim prejudice by reason of any delay. When they started using the pink label

in 1928, as testified to by Theodore Blackman, they already knew that plaintiff was entitled to the exclusive right to use the pink label and that Jacob Blackman had already been enjoined from using a pink label. Acting in privity with him they knew that they were violating this injunction by continuing to sell amidopyrine with a pink label. In view of their deliberate disregard of this injunction, any loss which they may sustain is the consequence of their own misconduct. (*Lammes* v. *Ward Bro. Co., Inc., supra.*) Therefore, the plaintiff is entitled to an accounting from the time of the entrance of the Federal court decree.

The defenses not having been sustained, interlocutory judgment for an injunction and an accounting must be rendered in favor of plaintiff. Findings passed upon. Submit decision embodying the findings approved without duplication; also submit judgment on notice.