LEVER BROTHERS COMPANY, Plaintiff, *v.* J. EAVENSON & SONS, INC., and Another, Defendants.

Supreme Court, New York County, November 4, 1935.

*De Forest, Cullom & Elder* [*Neil P. Cullom, Harry D. Nims* and *Henry W. Steingarten* of counsel], for the plaintiff.

*Cook, Nathan, Lehman & Greenman* [*Harold Nathan* and *Chester Rohrlich* of counsel], for the defendants.

MILLER, J. The plaintiffs are the manufacturers of Lifebuoy health soap. The defendant Eavenson manufactures a number of brands of "health soap," red in color and carbolic in odor. The defendant R. C. Williams & Co., Inc., sells one of these brands. (Reference hereinafter to "defendant" means the manufacturer, Eavenson.) The plaintiff establishes as a fact the use for almost forty years of a collocation of various features with reference to Lifebuoy soap. This collocation embodies red color, carbolic odor and octagonal shape. By the expenditure of large sums of money in advertising and sales expansion plaintiff asserts that it has developed and maintained a nationwide secondary meaning for this soap, and that it has thereby produced a distinctive commercial property or good will of great value.

From 1895, when the plaintiff commenced its business in the United States, "Lifebuoy" soap has constantly been reddish in color, carbolic in odor and octagonal in shape. At the time of its adoption plaintiff's collocation was not common to the trade. *Between 1895 and 1932, so far as is known, no other soap was sold in this State, or in the United States, that possessed plaintiff's collocation.*

Until 1901 plaintiff sold its soap in twin bars. Though plaintiff has sold its soap in a carton since 1901, the octagonal shape and reddish color of the bar have been constantly accentuated in its advertising. In 1915 plaintiff's octagonal soap was reduced to four ounces and has remained fixed at that weight throughout the past twenty years. While plaintiff has been selling soap rectangular in shape since 1923, this design is smaller in size and only three ounces in weight. During the past thirty-five years the sale and advertising of the plaintiff's soap for toilet and bath purposes has been nation-wide, *and its soap was generally known as the only red carbolic soap.* From about 1900 plaintiff has described its product as a healthy soap and as health soap. In 1909 the cartons bore the words "Lifebuoy Healthy Soap." It was originally advertised as Lifebuoy soap, but since 1912 it has invariably been advertised as health soap. The word "Health" was placed upon plaintiff's carton in 1915 and was there described as "Lifebuoy Health Soap." In 1929 the word "health" was impressed upon the upper and lower sides of the bar. At the

beginning of 1932 the term " Health Soap " was not in use by any soap manufacturer in the United States other than the plaintiff. The plaintiff's product, " Lifebuoy Health Soap," combined with the features of color, odor and shape, had acquired a secondary meaning by 1914, and was then and now is identified by this name and these features among the purchasing public throughout the nation.

The defendant Eavenson and its predecessor have been soap manufacturers in Philadelphia, Pa., and Camden, N. J., for over forty-seven years. They made and sold soaps at various times which were carbolic in odor, *but none that were octagonal in shape until 1933.* A red brand of soap was made by the defendant in 1914, but its manufacture was abandoned immediately thereafter. Before 1923, defendant made no other soap in this color, except in the following isolated instances, where a reddish shade was specified by the customer.

In 1898 or 1899, and for about two years thereafter, defendant supplied one Nattan, a druggist in Washington, D. C., with a brownish red soap. The sale of this soap was abandoned in 1901. In 1899 it made some Red Cross soap for Johnson & Johnson, of New Brunswick, N. J. In 1901 defendant manufactured for Johnson & Johnson, of New Brunswick, a special output of soap of the aggregate price of $1,169; in 1913 a small quantity of soap was made for the Curtis Publishing Company, of Philadelphia, for the use of its employees; in 1906 or 1909 an unknown quantity of soap was made for Jayne & Co., of Boston; between 1915 and 1922 the defendant Eavenson made for H. K. Mulford & Co., of Philadelphia, a soap, reddish in color, of a high carbolic content, mainly for sale to veterinarians for bathing animals.

In 1923 defendant began to solicit the trade in connection with the sale of soap reddish in color. The bars were *oval* in shape and carbolic in odor and were inclosed in rectangular blue cartons. Each carton was bordered by a yellow edge and had imprinted thereon in white letters the name " Jesco Skin Health Soap." Between 1924 and 1931 defendant made the following sales of this soap in New York State: Two in 1924, one in 1926, four in 1929, twenty-four in 1930, and eight in 1931. There were no sales made in this State in 1927. In 1925 three cakes of soap were sold, and in 1928 twenty-four cakes.

Testimony was submitted by the defendants that between 1914 and 1922 the defendant Eavenson made a red carbolic soap, oval in shape, which was *in all respects* similar to the soap which it placed on the market in 1923 under the name of " Jesco Skin, Health Soap," except that the name " Eavenson's Skin Health

Soap " was stamped on the bar, and that the soap was disposed of in buckets containing fifty cakes.

I do not find this to be the fact. I find that the manufacture of this soap was not continued after 1914. The contradictory testimony of the defendant's employees is unsupported by documentary evidence and is not convincing. No cake of soap made during this period has been submitted, and though cards showing the names and addresses of customers in 1923 were produced, there is no testimony from any dealer or consumer of a single sale of that soap within this interval of eight years. Mr. Jack Fink, the office manager of the defendant in 1920, and now in its employ, testified that this soap was not in existence in 1920 or at any time thereafter. This defendant did manufacture some Skin Health Soap in 1914, as its inventory at the close of that year showed a small quantity on hand. The inventory sheets for the following years were not introduced in evidence, though the court stated that they would be received if offered.

When, in 1923, the defendant placed its oval brand of red toilet soap upon the market under the name of " Jesco Skin Health Soap," it made the following public announcement: " In thus presenting Jesco Skin Health Soap to the public of America, its makers, J. Eavenson & Sons, Inc., of Philadelphia (Factory in Camden, N. J.) are giving to the world the *culminating* product of seventy-five years of intensive high grade soap making  *  *  * *Look for this carton* at your store [Italics the court's]  *  *  * but of all the soaps we have ever manufactured we are proudest of this cake of soap and which we are confident will be a welcome guest in a majority of American homes."

Bernard Marks, an employee in the sales department of the defendant, testified that in 1933 he was directed by the general manager *to order a die octagonal in shape* " *not too much like Lifebuoy,*" and that he instructed the manufacturer *that before he made the die* " *to buy a cake of Lifebuoy Soap.*" Immediately thereafter this defendant began selling soap octagonal in shape. As to this plaintiff, it was a second comer upon the market. Despite this circumstance, defendant made the shape, the color, the odor, the size, the width and the weight of its soap identical with the plaintiff's product, abandoned the term " Skin Health " and stamped on its soap the word " Health " which was being used by the plaintiff in describing its product, and, in addition, discontinued its carton, which was blue in color and then in use as a container. Impressed on the soap is the representative name of the dealer to whom defendant has made the sale. At present, the defendant impresses over eighty different names on the bars. This designed

union of separate similar elements affords basis for the testimony that immediately after defendant's bars appeared on the market in 1933 they were classified as "imitation soap."

"Each one of these distinguishing features might be separately used and no harm result. But when all, or a number of them, are combined in a single package, and so arranged and exhibited, that when they strike the eye of the intending purchaser, possessed of ordinary intelligence and judgment, the false impression is likely to be produced that the goods of the plaintiff are offered, it is the province of equity to interfere for the protection of the purchasing public as well as of the plaintiffs, and for the suppression of unfair and dishonest competition. The true test, we think, is whether the resemblance is such that it is calculated to deceive, and does in fact deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the conduct of the particular traffic to which the controversy relates." (*Fischer* v. *Blank*, 138 N. Y. 244, 251, 252.)

Ordinarily, the coloring matter, if functional, is free to all. Where the color is non-functional, it may not be copied if it has become associated with the plaintiff as its manufacturer or source. (*Champion Spark Plug Co.* v. *Mosler & Co.*, 233 Fed. 112; *Crescent Tool Co.* v. *Kilborn & Bishop Co.*, 247 id. 299.)

In the instant case the unnecessary imitation of non-functional parts is patent, and the appearance of the plaintiff's soap had come to represent the plaintiff as its origin.

Defendant asserts that the name "Lifebuoy" is the distinguishing feature of plaintiff's soap. The proof is clear that at least by 1914 Lifebuoy had become generally known and widely identified by distributors and the consuming public to be reddish in color, octagonal in shape and carbolic in odor. Defendant also insists that it distinguishes its soap by the name impressed on one side of the cake. If the name of each dealer was the same, this argument would still remain groundless. General resemblance, not incidental differentiation, is the test. The effect of such resemblance is significant. Without an advertisement for the ten-year period preceding December, 1933, defendant succeeded at once in inducing some fifty-nine different dealers in various parts of the United States to become purchasers of its octagonal soap.

The defendant, in reproducing plaintiff's color in combination with the shape and odor of plaintiff's soap, was "motivated by a design to profit by the plaintiff's reputation, investment and advertising, rather than by any utilitarian or functional considerations." (*American Chain Co.* v. *Carr Chain Works, Inc.*, 141 Misc. 303, 308.) It is not enough that the distinguishing marks may be

identified by a careful and discriminating purchaser. The casual or ordinary purchaser must be protected. A second comer should mark his goods to avoid deception of the public. The acts of this defendant were deliberate and it is clear that defendant's actual purpose was to mislead the public and to induce it to believe that it was buying the plaintiff's product. Actual unfair competition has resulted from the fraud of the defendant.

" That no deception was practiced on the retail dealers, and that they knew exactly what they were getting is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent." (*Warner & Co.* v. *Lilly & Co.*, 265 U. S. 526, 530.)

" We rest our conclusion here upon the fact that the color was adopted in part as a means of aiding the contemplated fraud, and that, if its adoption was also in part innocent, there is here a confusion caused by defendant; that the burden is therefore upon defendant to see to it that ultimate fraud does not result from this confusion; and that, so far as defendant cannot safeguard this result, it may not use the color." (*Coca-Cola Co.* v. *Gay-Ola Co.*, 200 Fed. 720, 724, 725.) (See, also, *Nu-Enamel Corp.* v. *Nate Enamel, Inc.*, 243 App. Div. 292; affd. without opinion, 268 N. Y. 84; *Mainzer, Inc.*, v. *Gruberth*, 237 App. Div. 89; *Brillo Manufacturing Co.* v. *Levine*, 236 id. 488; *Kallus* v. *Bimblick Toy Manufacturing Co., Inc.*, 229 id. 313; *Metz Laboratories, Inc.*, v. *Blackman*, 153 Misc. 171.)

Plaintiff was not obligated to institute suit until it had obtained evidence that the unfair competition of the defendant was in fact injuring its business.

The distribution by others at odd times and in separate localities of red carbolic soap, the manufacture of which has long since been abandoned, does not militate against the right of this plaintiff to be protected in its success in popularizing reddish toilet soap prior to the time when a similar soap was placed upon the market. The conclusion is inescapable that defendant intentionally imitated the plaintiff's soap and placed its imitation upon the market solely for the fraudulent purpose of appropriating plaintiff's reputation and investment and to attribute to defendant's product a false origin.

" When unfair competition is so designedly accomplished, all opportunity to continue it in any form should be prevented by an injunction sufficiently broad to insure such a result." (*Mainzer, Inc.*, v. *Gruberth, supra*, 93.)

Plaintiff is entitled to an injunction restraining defendant from manufacturing or selling soap carbolic in odor or octagonal in shape which is of a red, reddish or coral color, and from using the designation " health soap."

Judgment is directed for the plaintiff. Exception to defendants. Thirty days' stay. Submit findings of fact and conclusions of law.