OMAG OPTIK UND MECHANIK A. G. v. WEINSTEIN et al.

United States District Court
S. D. New York.
March 22, 1949.

632

Duell & Kane, New York City (Philip T. Dalsimer and Daniel H. Kane, New York City, of counsel), for plaintiff.

Mann & Burrows, New York City (William D. Burrows and Alan W. Mann, New York City, of counsel), for defendants.

KNOX, Chief Judge.

This suit concerns defendant's use of the trade-mark "Omag" on certain photographic items in the United States and in certain foreign countries. Plaintiff also claims damages against defendant.

The plaintiff, Omag Optik und Mechanik A. G., is a Swiss corporation engaged in the manufacture of photographic and optical items in that country. The firm was organized in 1925, under the name Optik und Mechanik A. G. The initials of the words of that title spell out "Omag," and, in 1931, the name was changed to its pres-

ent form. At plaintiff's instance, the trademark Omag was registered in Switzerland in 1925. Plaintiff will hereafter be referred to as Omag, and the mark also will be referred to as "Omag."

The individual defendant, Alex Weinstein, was and is engaged in the optical and photographic trade in this country through the medium of the several defendant corporations and partnerships. For convenience, Weinstein will be considered as the solo defendant, it being admitted that he controls and directs the activities of all the defendants.

In the early thirties, isolated sales of Omag products, marked "Omag," were made in this country in San Francisco, Chicago, and New York. It is doubtful whether these sales approached a total of $1,000. In this period, plaintiff appears to have employed only five or six people in its factory.

In 1935, defendant solicited plaintiff's representation, and in November, 1935, plaintiff wrote to defendant as follows: "With this letter we consider you as our distributer in America and this agreement is lasting until December 31, 1936. The cancelling of this contract can be done by either of the parties one month before the end of this contract. That means before the first of December, 1936. If, before this date, neither of the parties have written to cancel, this agreement is always lasting for another year." No mention was made of the mark "Omag." Weinstein testified that he understood that he was not to take on any agency that would be in competition with plaintiff's products.

In the years prior to the late war, and despite defendant's efforts at promotion, the business in plaintiff's goods never became extensive. The figures submitted were admittedly only approximations; they show that the total annual volume of business—computed on the basis of sales in dollars in this country—was never in excess of $8,000. Most of the business was in filters and filter mounts.

The business was carried on in the following manner: The items plaintiff supplied to defendant fell into three categories: (i) those which constituted plaintiff's regular line; (ii) those that were manufactured especially to defendant's order; and (iii) such as were created by plaintiff, not for its regular line, but submitted to defendant as samples with a request for orders. While it is impossible to tell from the evidence what proportion of the business was represented by each of these categories, it is clear that many items were made to defendant's specifications.

All items, of whatever category, were individually tested by defendant before being sold to photographic dealers throughout the country. Goods supplied by plaintiff to defendant were not on consignment, but were transferred by outright sale. Defendant undertook all expenses of promotion, including advertising, travelling costs, and the supply of display cabinets to individual dealers. In the very beginning, the items arrived individually boxed; however, quite early, the defendant supplied the boxes in which the individual items were sold to dealers.

The parties differ sharply in their versions of the importance of the mark "Omag," and of the Swiss origin of the goods. The evidence on these points is not entirely clear. Plaintiff appears not to have taken any interest in the matter at all. Defendant was actively concerned with creating a name that would help sales, and concentrated on "Omag." The Swiss origin was taken advantage of, but there was no definite effort to associate "Omag" with Switzerland. Much of the advertising, many of the products, and many boxes, did not mention Switzerland. Instead, defendant seems to have concentrated on associating "Omag" with the Chess-United Co., one of the defendants, which handled the distribution. Defendant contends that its promotional activities were directed to selling "Omag" as a standard of quality, rather than as a Swiss product. It is said that Switzerland had no particular reputation for the production of optical goods, and, indeed, it would appear that plaintiff was then the only concern of its kind in that country.

In 1934 or early 1935, the plaintiff promoted the establishment of a French cor-

poration called "Omag-St. Louis." This was done in order to avoid customs difficulties between France and Switzerland. The two concerns fell into dispute, and the French corporation began to ship "Omag" marked products into the United States. The defendant was outraged, and complained bitterly to the plaintiff. In letters which crossed, in December, 1936, plaintiff requested defendant "immediately (to) secure protection to us for our name Omag, if that is possible," and defendant announced that it was proceeding with registration without waiting for instructions, "assuming that you would be perfectly willing to share with us on a 50-50 basis the expense involved."

In the succeeding months, defendant promised that "the certificate * : * * will be forwarded to you as soon as it is received," and that, "as soon as the official publication comes thru, it will naturally be endorsed to you." Meanwhile defendant charged plaintiff with the full cost of the registration, viz., $200, and subtracted that sum from money otherwise due to plaintiff.

Plaintiff protested that the arrangement was for an equal division of the expense. When the mark issued, it was in the name of defendant. Plaintiff demanded an explanation, and defendant explained that this had happened "because registration can be accomplished either by a practicing U. S. attorney or a U. S. corporation." At the time of trial, Weinstein stated that what he had really meant to say was that only a registration owned by an American citizen or corporation could be filed with the Bureau of Customs, and thus be used to prevent imports. 19 U.S.C.A. § 1526. Weinstein reiterated the 50-50 proposition, and offered "to take 100% of the charges on our shoulders provided the trade-mark remains in our name." Plaintiff was alarmed in that the mark was registered in a class or category containing items which it did not supply to defendant. By way of reassurance, Weinstein replied that "If what you are afraid of is that we might sell other optical equipment under the name 'Omag' (equipment not made or bought from you) then forget about such fears because regardless of your misinterpretation

of our position, we are still anxious to protect your interests."

Thereafter, on December 17, 1937, plaintiff accepted the proposition, whereby defendant would bear the entire charge, and demanded that Weinstein remit the additional $100, which was still being withheld. Nevertheless, Weinstein refused to send the $100 to plaintiff, and it was only in January, 1939, that the second $100 was forwarded to the Swiss company.

■ Plaintiff contends that it is rightfully entitled to the benefit of the "Omag" registration. In order for one to enjoy the benefits of a registered trade-mark, it is not necessary that the mark be associated with the claimant's corporate name. Shaver v. Heller & Merz Co., 8 Cir., 1901, 108 F. 821, 65 L.R.A. 878; Nims, Unfair Competition and Trade-Marks, 4th Ed., p. 523. Thus, although "Omag" products were never marketed in this country in association with plaintiff's corporate name, plaintiff can properly claim such privileges in the mark as grow out of its prior use of the same, and also, such rights as arise from defendant's use of the mark in its capacity of plaintiff's exclusive distributor. It follows, therefore, that if defendant be held to be the beneficial owner of the mark, such ownership must derive from either the registration transaction, or from an equitable estoppel arising from plaintiff's conduct.

### The Registration Transaction.

Weinstein's testimony in this litigation contains a number of contradictions. In his deposition before trial, he claimed to have purchased the right to the mark; on his direct examination at the hearing before me, he stated that he stated that he did not claim to have purchased the benefits of the mark.

■ There is no doubt that Weinstein as an exclusive distributor had a registerable interest in the mark, and that the beneficial rights to the same could have been transferred from plaintiff to defendant. Scandinavian Belting Co. v. Asbestos & Rubber Works, 2 Cir., 1919, 257 F. 937, certiorari denied 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186; Nelson v. J. H. Winchell & Co., 1900, 203 Mass. 75, 89 N.E.

180, 23 L.R.A.,N.S., 1150; Nims, Unfair Competition and Trade-Marks, 4th Ed., Sections 17, 212.

It is important, consequently, to determine whether in effect, such a transfer was effected. Where, as here, the rights prior to the registration were in the manufacturer, which the distributor conceded at the time, and the distributor registered the mark in his own name, contrary to the wishes of the manufacturer, the distributor, before he can claim the full benefits of the registration, must show a clear intention on the part of the manufacturer to transfer the mark to the distributor. After carefully weighing the evidence, I can not but conclude that plaintiff was without any such intention. Omag relied on defendant for all things connected with the American business, both because of the relation between the parties, and because defendant, as an American trader, was assumed to know such things. Defendant did not represent or suggest that it would claim ownership of the mark by reason of the fact that plaintiff permitted the registration to stand in its name. Omag seems to have regarded the registration more or less as a technicality, which had no vital bearing on the ownership of the mark, an attitude for which defendant's action of registering in its own name may well have been in part responsible. Omag probably supposed, and quite correctly, that before the anticipated assignment, the mark itself belonged not to defendant, in whose name the registration stood, but to plaintiff. There is no reason to believe that Omag contemplated a transfer of its rights to defendant for $100. The controversy between the parties was concerned solely with the matter as to which of them should pay for the registration. With one minor exception, defendant had paid all previous expenses connected with the American exploitation of Omag products, and plaintiff doubtless expected defendant to share the registration expenses and was happy when he offered to shoulder the entire cost of $200. Furthermore, there is evidence in the record that Omag accepted defendant's offer before December 1, 1937. The contract between the parties was terminable any year before December 1st. It is unreasonable to believe that plaintiff, in accepting the offer, meant to permit, or to risk, defendant's termination of the contract at the end of the year, with defendant remaining the owner of the mark "Omag" in the United States.

### Laches, Estoppel, and Unclean Hands.

At this point, it is appropriate to consider defendant's contention that Omag is barred by laches, estoppel, and unclean hands, from asserting any rights to the mark.

The business between the parties continued on a small scale up until the war years. The last order placed by defendant was in October, 1940, and plaintiff's last shipment of merchandise was made in that year. Although the evidence is not conclusive, it is fairly to be inferred that shipments ceased not because plaintiff chose not to continue, but because war conditions in Switzerland, and uncertainties in shipping conditions, rendered further exports impracticable.

At an early date defendant had adopted the practice of manufacturing individual "Omag" pieces to make up complete sets of filters for sale to American dealers. However, sometime before imports from Europe came to an end, Weinstein began the local manufacture and sale of "Omag" marked products on a more extensive scale, and these activities were not confined to replacement purposes. This practice at no time was disclosed to plaintiff.

In addition, in 1938, defendant began the manufacture of a so-called commercial, or low-priced, line of filters. These filters were supplied to large retail establishments, such as Macy's, under the outlet's own trade-mark. Weinstein testified that these filters, while not essentially differing in quality from the "Genuine Omag" filter, were not competitive, because of certain price differentials. The "Omag" filter was an expensive item, promoted with high commendation, and was expensively mounted and packaged. The commercial filter, however, lacked all such marketing advantages. Consequently, persons with ex-

pensive cameras bought the "Omag" type filter, and those owning cheaper cameras purchased the low-priced filter. Weinstein did not disclose these activities to plaintiff, notwithstanding that he had assured plaintiff in February, 1939, in reply to a letter suggesting Omag's suspicions as to the propriety of his conduct that "I would never countenance our producing filters in America so long as our relationship with Omag exists. Is that clear?"

During the war years, after imports had ceased, Weinstein continued to sell relatively small quantities of "Omag" marked products. These were manufactured in this country, except when an order could be filled from inventories of Swiss merchandise. In March of 1944, Weinstein cabled to Omag, inquiring as to when exports might be resumed. In December, 1945, after much prodding, Omag submitted prices on a small number of items. By way of answer to these quotations, Weinstein asserted that the OPA refused to allow imports at prices above those prevailing before 1942, and requested new prices. Omag replied, "Cannot quote lower prices shall we look for other agents," to which Weinstein responded, in January, 1945, "Have no objection your looking for other agents but we must advise that we own the Omag trademark * * *."

Thereafter Weinstein persisted with further inquiries, which elicited the following cable from plaintiff in June, 1945: "No longer interested in further dealing Stop Information re pre-war prices pure invention." However, in July, 1945, plaintiff relented somewhat, and wrote that the decision would be reconsidered if Weinstein paid a visit to Switzerland.

In October of 1945, the American Bolex Company, an American distributor of imported photographic goods, became interested in Omag, and took steps to solicit its exclusive representation in this country. In January, 1946, the Bolex Co. advised plaintiff that Weinstein was manufacturing "Omag" marked products at two plants in this country.

In February, 1946, all the shares of the Omag Company were sold to Henry Wild & Co., a large Swiss manufacturing concern. The sale price was based exclusively upon an evaluation of the physical assets of the Omag business, and did not reflect any consideration for good will or other intangibles. Subsequently, a close relationship was formed between the Bolex Co., and the new owners of the plaintiff, and this contemplated the elimination of Weinstein as a distributor for plaintiff, and the granting of exclusive United States distribution to the Bolex Co.

In the early post-war years, Weinstein for the first time was able to develop the "Omag" line of business on a large scale. On Weinstein's own approximation, he did $20,000 in Omag business in 1945, $20,000 in 1946, $225,000 in 1947, and $80,000 in the first ten months of 1948. In 1946 and 1947, Weinstein spent large sums in advertising his "Omag" product. At the same time, by claiming ownership to the registration filed with the Customs, Weinstein prevented plaintiff from shipping any "Omag" items into this country.

■ The law seems to be that mere delay, even though protracted, will not necessarily create an estoppel against the enforcement of trade-mark rights. If estoppel does arise, the delay must have "continued so long and under such circumstances as to defeat the right itself." Nevertheless, it is likewise the law that where this is not the fact, extended delay may be sufficient to bar an accounting. Menendez v. Holt, 1888, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; William P. Goldman & Bros. v. Gold, Sup.1925, 211 N.Y.S. 868; William P. Goldman v. Goldstein, 1925, 125 Misc. 737, 211 N.Y.S. 872; Rosenberg v. Rosenthal, 1929, 135 Misc. 282, 238 N.Y.S. 62; Winifred Warren, Inc., v. Turner's Gowns, Sup.1940, 16 N.Y.S.2d 994, trial court affirmed 1941, 285 N.Y. 62, 32 N.E.2d 793; Socony-Vacuum Oil Co. v. Lafariere, Sup.1944, 48 N.Y.S.2d 421; Nims, Unfair Competition and Trade-Marks, 4th Ed., Section 413.

■■ It is my opinion that since Omag did not suppose it had signed away its rights to the mark, by permitting the registration to stand in defendant's name, and

since the mark was not transferred, no estoppel arises from the registration that defendant accomplished. Nor can an estoppel be based on defendant's early manufacture of "Omag" products, since Omag had no notice of what defendant was doing. It may be added that plaintiff was not required to seek out such unfair competition. H. A. Mets Laboratories v. Blackman, 1934, 153 Misc. 171, 275 N.Y.S. 407.

In September, 1941, defendant wrote to plaintiff as follows: "This morning we learned that Omag filters are being offered by a Mr. Fields operating under the name of 'Swiss Photo Studios.' It appears that Mr. Fields is one of your friends whom you told that we are no longer acting in the capacity of agents for Omag products. You will remember that we assumed the rights to this name and registered it in line with your instructions to that effect. Furthermore, you will remember that we are still agents for Omag * * *."

Inasmuch as this letter fails to claim any rights that are adverse to the mark, as distinguished from the registration, and since plaintiff could well have believed—and was in fact reassured—that Weinstein was not manufacturing competing "Omag" products, the communication can not be regarded as an estoppel.

When defendant cabled plaintiff, in January, 1945, that you may look for other agents, but we own the mark, plaintiff had its first clear-cut notice that an adverse claim was being made against it.

So far as appears on the record, plaintiff did not learn of Weinstein's manufacture until the Bolex Co. brought the facts to its attention in January, 1946. Despite these communications, of January, 1945, and January, 1946, there is nothing in the record to show that plaintiff asserted the present contentions until May, 1947, when the present suit was filed.

Although defendant does not question the general rules above mentioned, he places strong reliance on this phase of the discussion on three decisions, viz., Overhamm v. Westall, 1946, 271 App.Div. 492, 66 N.Y.S.2d 371, George B. Graff Co. v.

H. C. Cook Co., 1924, 55 App.D.C. 136, 2 F.2d 938, and Roma Wine Co. v. Roma Wine & Liquor Co., Inc., D.C.Del.1948, 80 U.S.P.Q. 69. In each of these cases distributors were accorded rights in marks originally belonging to the manufacturer.

In the absence of inequitable conduct on the part of the manufacturer, a distributor who employs the mark of his principal, does not acquire a proprietory interest in the mark that will serve to extinquish the rights of the manufacturer. Wellman v. Holzer, Sup.1945, 56 N.Y.S.2d 299, affirmed 271 App.Div. 775, 66 N.Y.S. 2d 407; Shaver v. Heller & Merz Co., 8 Cir., 1901, 108 F. 821, 65 L.R.A. 878; U. S. Ozone Co. v. United States Ozone Co. of America, 7 Cir., 1932, 62 F.2d 881; Stratton & Terstegge Co. v. Stiglitz Furnace Co., 1935, 258 Ky. 678, 81 S.W.2d 1.

The Overhamm and Graff cases have little, or no, application here. In each instance the distributor had expended considerable time and money in exploiting the mark, and the court found that the same had, in fact, become associated with the distributor, rather than with the manufacturer, and that, in the circumstances, it would be inequitable to grant an exclusive right to the manufacturer. This inequity was based on more than the fact that the parties stood in the relation of manufacturer and distributor. In the Overhamm case, the manufacturer unreasonably deprived the distributor of the right to use a second associated mark. In the Graff case the manufacturer had the right to insist that its name appear along with the mark, and that the distributor's name should not appear. Instead, the manufacturer permitted the distributor's name to appear, while the manufacturer's did not.

These cases do not dispute the general rule, above referred to, but rely on the fact that there was some particular inequity in the manufacturer's conduct. In such a case, rights may be accorded to a distributor even where a similar degree of inequity would not create rights to the mark in a stranger, for a distributor uses the mark legitimately, with the consent of the owner, and a stranger does not.

In the instant case there is no foundation for the application of this rule, because the defendant's use of the mark was not legitimate. The greater portion of defendant's effort, together with the overwhelming portion of its advertising costs, were expended at a time when it was, in truth, violating its obligation to plaintiff. If defendant had not begun its own manufacture of the products in question, under the "Omag" mark, before plaintiff's imports were cut off, and if plaintiff, instead of war conditions, had been responsible for its inability to send its products to the United States, it would then be necessary to determine whether there are facts sufficient to create an estoppel, under the Overhamm and Graff rulings. But on this record, defendant can not appeal to them.

The case of Roma Wine Co. v. Roma Wine & Liquor Co., Inc., supra, is pertinent to the present discussion. In that litigation, the distributor employed the mark in question on goods purchased from third parties, apparently in violation of the obligations owed to the manufacturer with whom it had established a fiduciary relationship, and yet the distributor was protected. Nevertheless, upon the existing facts, the distributor was held to be protected, within certain limitations, in its use of the mark. The theory was that an estoppel had arisen against the manufacturer. The estoppel was based on two grounds. In the first place, the manufacturer consented, after some dispute, to the distributor's registration of its corporate name, which included the mark "Roma." · Secondly, while the court found that there was no credible evidence that the manufacturer knew that the distributor was selling wine purchased from third parties, under the manufacturer's mark, the court held that "it is clear from the weight of the credible evidence that plaintiff (the manufacturer) knew defendant had built up a very substantial wine and whiskey business independently of any goods that it purchased from plaintiff, which plaintiff should have thoroughly investigated from the trade mark aspect, and plaintiff might have obtained relief by appropriate court proceedings several years ago. * * *"

The Roma case is not controlling for two reasons.

First, the court there found grounds for estoppel in the manufacturer's failure to investigate the distributor's independent business, when the manufacturer had been aware of that business for several years. Here the plaintiff was not informed of defendant's outside manufacture until sixteen months before suit was filed, and further, the law of New York does not seem to require the manufacturer to seek out such unfair competition. H. A. Metz Laboratories v. Blackman, 1934, 153 Misc. 171, 275 N.Y.S. 407. Secondly, the manufacturer there permitted an adverse registration of the word "Roma" as part of its corporate name, while the registration here was not thought to be adverse. The adverse registration in the Roma case could certainly be held to be an implied consent to the distributor's development of a separate business under the aegis of that mark.

Thus, there being no applicable exception derived from the relationship of the parties, the general rule, stated above, applies. Under that rule I must hold that plaintiff is not estopped in its present contention.

■ At the same time, under that general rule, in view of the two communications, of January, 1945, and January, 1946, and considering the volume of defendant's advertising, and his business, in 1946 and 1947, and plaintiff's awareness of "the value of his (Weinstein's) propaganda in the U. S. A.," I believe it would be improper to order an accounting. What effect, if any, would follow from the fact that defendant owed fiduciary duties to plaintiff, need not be examined, because I think the evidence reveals that the relationship between the parties was terminated, or had lapsed, on June 29, 1945, when plaintiff cabled to defendant: "No longer interested in further dealing * * *."

All things considered, inasmuch as defendant is not the owner of the mark "Omag," he must also be enjoined from using the marks "Proxomag" and "Distomag," regardless of the date on which the applications for those registrations were filed, and also, should not be permitted to

use the corporate title, "Omag, Inc." Defendant's use of "Omag" in this country, and the confusion which would ensue were he now permitted to use such similar marks, necessitate this result.

### Foreign Patents.

The defendant has filed applications for patents in 18 foreign countries, and many registrations have issued on these applications.

A Canadian registration issued in 1939, and a Mexican one in 1940. Since there is no doubt but that defendant was plaintiff's exclusive representative in those years, and filed these applications in the capacity of plaintiff's agent, the marks properly belong to plaintiff.

Except for Canada and Mexico, there was no proof that the plaintiff had done or was likely to do business in any of these countries. Plaintiff can not claim any rights to these other applications and registrations unless defendant owed some fiduciary obligation to plaintiff at the time of filing. George W. Luft Co. v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536. Since the relationship terminated before any of these applications were filed, plaintiff has no claim to them.

Findings of fact and conclusions of law as required by Rule 52(a), Federal Rules Civil Procedure, 28 U.S.C.A., appear sufficiently within the above opinion, in accordance with the amendment to that Rule.