WINTHROP CHEMICAL Co., INC., Plaintiff, *v.* JACOB BLACKMAN and Others, Defendants.

Supreme Court, New York County, January 9, 1934.

*Boehm & Zeiger, Edward S. Rogers* and *James F. Hoge* [*Louis Boehm* and *David Rasch* of counsel], for the plaintiff.

*Morris Kirschstein* [*Morris Kirschstein* and *Albert T. Scharps* of counsel], for the defendants.

McLAUGHLIN, J. This is an action in equity for a permanent injunction against the defendants for infringing upon five trade-marks of the plaintiff and for an accounting to the plaintiff for all damages sustained by it owing to such infringement by the defendants. The plaintiff and the defendants are in the same field of business. These trade-marks of the plaintiff are Veronal, Aristol, Protargol, Theominal and Kres-lumin. The products put out by the defendants are known as Barbital (introduced as Veronal), Thymol Iodide (introduced as Aristol), Silver Proteinate (introduced as Protargol), Theobrominal and Kre-o-minal. Volumes of testimony have been taken, thus giving the defendants every latitude to establish the defenses set up in their answers. The case is one that is important not only to the litigants, but to the public as well. Careful consideration has been given to the testimony and also to the arguments of the parties as presented by their able counsel, and to the thoroughly exhaustive memoranda they have presented.

After considering everything I can come to but one conclusion. There must be a judgment in favor of the plaintiff in this case. If the law of unfair competition is to survive it should be enforced in a manner so to give it life and not to throttle it. The mere fact that by indirection the defendants poach upon the rights of the plaintiff does not prevent equity from giving the same relief as if they had boldly usurped the entire names adopted by the plaintiff in its trade-marks or had used its trade-marks alone and not in connection with any other words on its products. It would appear from what has been before the court in this case that there has been a studied, unfair effort on the part of the defendants to obtain the benefit of the character and reputation of the plaintiff's products, without expense on their part, and to the detriment of the public and the plaintiff alike. Simulation and deceit are plainly present in all the articles of merchandise of the defendants that are challenged by the plaintiff.

Plaintiff has clearly shown that it has valid trade-marks for every product in question here — Veronal, Protargol, Theominal, Kreslumin and Aristol. Under section 16 of the Trade-Mark Act of 1905 (U. S. Code, tit. 15, § 96) such trade-marks are *prima facie* evidence of ownership. It is also established that these trade-marks have been used for years, and it is but a fair inference from the facts in this case to say that they identify plaintiff's products. It has been shown that many hundreds of thousands of dollars have been expended to bring this thought home to the professions and to the public. There are and have been many representatives of the plaintiff whose duty is to show the merit of these trade-mark articles to those who use or dispense them. A most thorough system of information has been conducted by the plaintiff to inform those using them that they are its products and they represent distinction and worth in the trade of medicinal articles. Proof has been given to show that there have been real results flowing from these efforts of the plaintiff. Physicians and others familiar with drugs and their uses have uniformly stated that the plaintiff's goods were of the highest character and were genuinely superior articles. These witnesses invariably associated these products with the name of the plaintiff. It certainly required great effort to attain this point. The defendants say that this matters not because they question the validity of some of the trade-marks and also present certain defenses, which contentions must be disposed of separately under the discussion of the several products.

It would be too extended a thing to go into the ownership of all these trade-marks and their history. I have examined into the origin as shown by the testimony and the exhibits and there is not the slightest doubt about the plaintiff's ownership. Let us take up Veronal, which it is claimed is infringed upon by the defendants' product Barbital (introduced as Veronal). A great deal of latitude was permitted the defendants in their attempt to question the right of the plaintiff to the trade-mark Veronal. Much has been said about the original ownership by the German company known as E. Merck of Darmstadt. It is quite plain that this company gave the right or license to the German Bayer Company to manufacture and dispense this drug. An American concern named Merck & Company had the right to distribute this article before, but not after, the World war. The Alien Property Custodian seized and sold all the patents and trade-marks property of the German Merck Company to the Sterling Products, Inc., after the war. This company assigned this trade-mark to the plaintiff in 1919. It is evident, then, that since 1919 nobody except the plaintiff had the right to use this trade-mark.

The defendants claim that Veronal is not now the exclusive property of the plaintiff. Numerous exhibits have been received both in the form of packages of other parties for the same article and catalogues and other papers showing that other proprietors at certain periods of time dispensed these articles under the name of Veronal to the public. In addition there is oral testimony to the same effect. The court is not impressed with any of this testimony to the extent of defeating the plaintiff's claim for a valid trademark for its brand. I am considering the various defenses raised on the merits, although there is grave doubt as to the sufficiency in law of some. (*Seeck & Kade, Inc.*, v. *Pertussin Chemical Co.*, 235 App. Div. 251; *Albany Packing Co., Inc.*, v. *Crispo*, 227 id. 591; *Bregstone* v. *Greenberg*, 192 id. 213.)

I do not believe that Veronal is a descriptive term. The plaintiff's witnesses show that it was an arbitrary term, and in this contention they are supported by some of the witnesses produced by the defendants. With the exception of Mr. Morgenstern and Dr. Edlin, no one said it was a descriptive term.

The court disregards Dr. Edlin's testimony in its entirety. He did not show enough knowledge of the subject to be helpful as an expert, and the court regards Mr. Morgenstern's testimony as not entitled to any weight because it saw the witness' manner and heard his many statements, some of which could not be the fact.

With respect to the testimony introduced by the defendants in the form of extracts from dictionaries, journals, medical and pharmaceutical books to indicate that Veronal, Protargol and Aristol are descriptive names, I have assumed that this evidence is competent, although there is authority to the contrary. (*Rossman* v. *Garnier*, 211 Fed. 401.) I am constrained to find that this evidence is of little, if any, weight, as it appears that it is the practice of the authors of such publications to include all names of drugs, both proprietary and descriptive, in their works without differentiation as to common and proprietary names. On this point, the most substantial publications, including the two most recognized authoritative books on the subject in this country, namely, the United States Pharmacopœia and New and Non-Official Remedies, the former published under the authority of the United States government, the latter by the Council on Pharmacy and Chemistry of the American Medical Association, bear out the plaintiff's contention that Veronal, Protargol and Aristol are not the common or descriptive names of the drugs.

Veronal has been widely sold in this country by the plaintiff; over 5,250,000 packages have been sold since 1919. This is as a consequence of the long and continued use by the plaintiff of this

trade-mark and is the result of its efforts to inform the professions and the public of its product. This wide-spread dissemination does not justify the defendants in the use of this trade-mark. If this argument were sound, then every time a plaintiff obtained the the result of having the public purchase its article, that fact of itself would destroy a trade-mark. Arbitrary trade-marks cannot become generic in this way. (*Jacobs* v. *Beecham*, 221 U. S. 263; *Coca-Cola Co.* v. *Koke Co. of America*, 254 id. 143; *Imperial Cotto Sales Co.* v. *Fairbanks Co.*, 270 Fed. 686; *Celluloid* v. *Cellonite Mfg. Co.*, 32 id. 94.)

These products have been long associated by the public with the plaintiff. They indicate and identify the plaintiff's products; they are the result of the money expended and the efforts of the plaintiff to familiarize the public with its trade-mark products. Assuming that they were originally descriptive terms, although the opposite has been established here, nevertheless, they have acquired a secondary meaning and the trade-mark will be protected from an infringement by the defendants. (*Coca-Cola Co.* v. *Koke Co. of America*, 254 U. S. 143, 145; *Le Blume Import Co., Inc.*, v. *Coty*, 293 Fed. 344; *Orange Crush Co.* v. *California Crushed Fruit Co.*, 297 id. 892; *United Drug Co.* v. *Parodney*, 24 F. [2d] 577; *Standard Oil Co. of Maine* v. *Standard Oil Co. of New York*, 45 id. 309; *Fishel & Sons, Inc.*, v. *Distinctive Jewelry Co., Inc.*, 196 App. Div. 779.)

The defendants claim that the plaintiff's trade-mark Veronal has become *publici juris* through abandonment. They have cited several authorities, all of which have been examined by the court. That there may be an abandonment cannot be questioned. If there is an abandonment, of course, the plaintiff would lose its exclusive right to the trade-mark. I cannot find any abandonment in this case by any intention as expressed in the testimony produced before me. The efforts used and the money expended by the plaintiff in advertising the trade-mark negative any such intention. The court cannot infer abandonment by reason of the fact that several others continue to use the name Veronal on their products. That others may have claimed the right to it is immaterial. Some of the reliable houses when shown the source of title and its strength have discontinued the use of the trade-mark. In adopting the methods the defendants have in putting out their Barbital, they cannot hide behind the forms of others who present an all too unethical part of our business fabric. That others have and are infringing on the trade-mark does not excuse the defendants in the slightest degree. (*Anheuser-Busch* v. *Budweiser Malt Products Corp.*, 287 Fed. 243; affd., 295 id. 306.) It might be stated that

whenever infringement has appeared the plaintiff has objected to such infringement. Nor can the court find that this objection has been weak or feeble. The objections have been voiced in such a strong manner that nothing is left except a few insignificant infringements. This applies to Merck & Co.'s use of the trade-mark. As to the other three users, Hance Bros. & White, the American Pharmaceutical Company and J. T. Baker Chemical Company, the failure to proceed against them cannot be deemed prejudicial to the plaintiff. (*Lammes* v. *Ward Bros. Co., Inc.*, 134 Misc. 288, 290; affd., 227 App. Div. 840.) The methods employed by the plaintiff to discover infringement also destroy the existence of any intent to abandon the trade-mark. When an infringer was discovered an executive officer of plaintiff communicated this fact to the legal department, and if, upon notice, the infringement was not discontinued then the matter was sent to its attorneys to commence suit.

A trade-mark is that which distinguishes a person's goods from those of another. It is a stamp of the genuineness of the merchandise. (*Kipling* v. *Putnam's Sons*, 120 Fed. 631, 635; *Elgin National Watch Co.* v. *Illinois Watch Case Co.*, 179 U. S. 665, 673.) " The function of a trade-mark is to point out the maker of the article to which it is attached." (*Waterman* v. *Shipman*, 130 N. Y. 301, 311.)

It gives the right to prohibit the use of it so as to protect the owner's good will against the sale of a product as his. The cases cited by the defendants contain facts which show such enormous sales by the alleged infringing competitors and others that over a period of many years it had become so generally sold by others as to destroy the trade-mark.

The leading cases cited of *French Republic* v. *Saratoga Vichy Co.* (191 U. S. 427, 436) and *McKesson & Robbins* v. *Phillips Chemical Co.* (53 F. [2d] 342) exemplify this statement when it appears that in each of them the sale by others far exceeded that of the owner of the trade-mark. The remaining authorities are along the same line and surely do not fit the facts and circumstances of this case.

It is not doubted that before the war Merck & Co. had the right to distribute Veronal as one of the products of E. Merck & Co. of Darmstadt, the German concern, but when the latter's property and good will were seized by the Alien Property Custodian and sold to plaintiff's assignor, the American concern, Merck & Co., had no legal right to sell or distribute it any longer. It was this original right which has apparently confused some of the few reputable houses who apparently thought that this right had con-

tinued. To their credit it may be said that as soon as the extinguishing of this right in Merck & Co. was shown they discontinued their practice. The use of any infringement certainly decreased as time went on. The evidence in this case shows that today Veronal indicates to the public the product of the plaintiff. The proof before me indicates that none of the infringing concerns did so because they regarded it as a generic term. It cannot be questioned that they did so because of the original rights of Merck & Co., which were destroyed when the Alien Property Custodian stepped in. These abortive attempts of others to appropriate the plaintiff's trade-mark, whether through ignorance or design, cannot deprive the plaintiff of its exclusive use. (*International Cheese Co.* v. *Phenix Cheese Co.*, 118 App. Div. 499, 501.)

It is urged that this trade-mark Veronal became public property because the drug Barbital was manufactured under a patent in which Veronal was the generic name used. I cannot coincide with the defense either upon the law or upon the facts in regard to this issue. In the first place, Veronal is not the generic name of the patented article. Diethylbarbituric acid, which was subsequently shortened into Barbital, was the generic term of the patented article. The patent itself shows this, for there is no reference to Veronal in the patent. The conduct of the plaintiff in advertising its trade-mark Veronal during the existence of the patent and the labels used, showing that Veronal was its trade-mark, shows that the plaintiff never permitted this trade-mark to become a generic term. That others have infringed does not justify the defendants in the slightest degree or give them the right to infringe upon the plaintiff's trade-mark rights. If the others have done wrong that is no excuse for the defendants in doing likewise. (*Ward Baking Co.* v. *Potter-Wrightington, Inc.*, 298 Fed. 398; *Luxor Cab Mfg. Corp.* v. *Leading Cab Co., Inc.*, 125 Misc. 764; affd., 215 App. Div. 798; *Cuervo* v. *Henkell*, 50 Fed. 471; *Actiengesellschaft Vereinigte Ultramarin-Fabriken* v. *Amberg*, 109 id. 151.) Most of these infringers make no claim to the trade-mark Veronal and recognize it as the property of the plaintiff.

I have examined closely into the claim of Merck & Co. to the right to use this trade-mark. It, too, is an infringer. It had no right to sell Veronal since the World war. However, its infringement from the evidence in this case is rather trivial, because the testimony is overwhelming that its use did not mislead, and the best proof of this is the difficulty that Mr. Blackman had to purchase Veronal put out by Merck which he desired to use as evidence in this case. (*Tetlow* v. *Tappan*, 85 Fed. 774; *Newman* v. *Alvord*, 51 N. Y. 189.)

The authorities cited by the defendants are applicable to cases where the trade-mark is the generic name of the patented article. Even the American Merck Company designated Veronal as an arbitrary term and gave the common name as diethylbarbituric acid. That has always been the position taken by the plaintiff. I must find this as a fact from the testimony in this case. I also find as a fact that this patented article has been identified with the manufacturer, and such identification has increased rather than diminished until today it is practically exclusively identified with the plaintiff notwithstanding the several inconsequential infringements which still persist. There is no proof from which the court could find that Veronal was the generic term of the patent. On the contrary, the proof appears overwhelming that it was not a generic term, and, therefore, at the expiration of this patent it did not pass to the public. (*Hughes* v. *Smith Co.*, 209 Fed. 37; *Scandinavia Belting Co.* v. *Asbestos & Rubber Works of America, Inc.*, 257 id. 937; *Prest-O-Lite Co.* v. *Davis*, 215 id. 349; *Searchlight Gas Co.* v. *Prest-O-Lite Co.*, Id. 692.)

The plaintiff has been charged with laches in bringing this action. I find that there is no merit to this contention. We start off with the fact that there was no acquiescence by the plaintiff in the defendants' use of the trade-mark Veronal. The evidence shows that the plaintiff protested against the use of this trade-mark. It would appear also that the defendants promised to discontinue this use but that they broke this promise. There has been no prejudice to the defendants in failing instantly to bring this suit, and the time between this promise and the commencement of this action is certainly too short a period upon which to predicate laches. I am also of the opinion that the period of discovering the infringement and the bringing of the action is also too short a time on which laches can be claimed. (*Goldman & Bros., Inc.*, v. *Goldstein*, 125 Misc. 737; *McLean* v. *Fleming*, 96 U. S. 245.)

The defendants claim through Mr. Blackman that they had express permission from Mr. McClintock, of the plaintiff's company, to the effect that they could use the trade-mark Veronal. No such defense is alleged in the answer. Aside from the legal proposition involved in the admission of this evidence I decide the issue between these two men in favor of the plaintiff. No such permission was even given.

Protargol is a registered trade-mark of the plaintiff which was registered in the United States Patent Office on November 23, 1897, and through successive valid assignments became the property of the plaintiff on March 21, 1919.

A renewal of the trade-mark registration was granted to the

plaintiff on November 1, 1927. This trade-mark is infringed upon by the defendants when they put out Silver Proteinate with the accompanying words "Introduced as Protargol."

Aristol is also a registered trade-mark of the plaintiff which was registered in the United States Patent Office on January 14, 1890, and by successive assignments became the property of the plaintiff on March 21, 1919. A renewal of the trade-mark was granted on August 16, 1921. The defendants infringe upon this trade-mark by selling its product Thymol Iodide (introduced as Aristol). Protargol and Aristol are assailed generally upon the same grounds as Veronal. What has been said about the failure of this attack in regard to Veronal applies with equal force to these two trade-marks, although it may be stated that there was no expired patent involved in regard to Aristol. Likewise there has been no infringement upon the trade-mark Protargol by other concerns. The decision of the court in other respects is the same as to these trade-marks.

The defendants' use of Theobrominal is an infringement upon plaintiff's trade-mark Theominal. It is conceded that they closely resemble each other in sound but that resemblance is minor when we consider the facts in the case. Theominal is not a descriptive term because of itself it does not describe anything. It is a combination of two drugs, theobromine and phenobarbital. The evidence is conclusive that it is an arbitrary word used by plaintiff and by which its product is recognized. The only matter before the court is whether the defendants have been guilty of an infringement upon the trade-mark Theominal by the use of Theobrominal. An attempt is made to prove that Theobrominal is descriptive of the defendants' product. It may be descriptive of one of the ingredients of the drug (theobromine), but it is certainly not descriptive of the drug itself as that also contains phenobarbital. The term Theobrominal is just as arbitrary as the term Theominal. Even if the term Theobrominal were descriptive of a preparation, the adoption of that name being so similar to Theominal that an injunction would issue. (*Fairbank Co.* v. *Central Lard Co.*, 64 Fed. 133; *Noel* v. *Ellis*, 89 id. 978.) A comparison of the two preparations leads to the inevitable conclusion that the defendants attempted to make their article so closely resemble the plaintiff's that it could be easily palmed off on the public as the latter product. The names are certainly similar both in spelling, appearance and sound. There is a marked similarity in the bottles and the same may be said of the labels. The ingredients are the same.

It is plain that the adoption of the word Theobrominal is for the purpose of deception and confusion to the public and the

detriment of the plaintiff. (*Waltke* v. *Schafer*, 263 Fed. 650, 652; *T. A. Vulcan* v. *Myers*, 139 N. Y. 364; *German-American Button Co.* v. *Heymsfeld, Inc.*, 170 App. Div. 416; *Cash, Inc.*, v. *Steinbook*, 220 id. 569; *Lambert Pharmacal Co.* v. *Bolton Chemical Corp.*, 219 Fed. 325.)

As to the trade-mark Kres-lumin, I cannot accept the view of the defendants that its only similarity " resides in the first three letters ' K R E.' " I agree with the plaintiff's contention that the adoption of the word Kre-o-minal to designate its product is an infringement by the defendants of two trade-marks " Kres-lumin " and " Theominal." Kres-lumin is an arbitrary term and is not descriptive of the product. The medical profession and the drug trade recognize it as the plaintiff's preparation. It does not require any effort to see that parts of both trade-marks are incorporated in Kre-o-minal. The labels on the bottles of Kres-lumin and Kre-o-minal are very similar as to printed matter. The most serious argument made by the defendants is that Theominal is used for a different purpose than Kre-o-minal, but the gravamen of the offense appropriating trade-marks is nevertheless present. The intended deception of the defendants is to sell their goods as those of the plaintiff. That which the defendants could not legally do with regard to one product applies with equal force when they simulate in one preparation two of the plaintiff's valid trade-marks. That one of these trade-marks may in part be for a different kind of remedy and, therefore, a different product presents no defense. (*Long's Hat Stores Corp.* v. *Long Clothes, Inc.*, 224 App. Div. 497; *Rogers, Ltd.*, v. *Majestic Products Corp.*, 23 F. [2d] 219; *Forsythe Co., Inc.*, v. *Forsythe Shoe Corp.*, 234 App. Div. 355.)

The entire picture that is presented by the record in this case is one which shows that the defendants are engaged in a deliberate campaign to gather to themselves by infringement upon the plaintiff's legitimate trade-marks, business and trade that they are not entitled to. In this equity must take a stand to protect the plaintiff's business which has a good will and real reputation which are the results of the efforts and expenditures of this plaintiff. The plaintiff is granted a permanent injunction restraining the defendants' infringement and simulation of the plaintiff's trade-marks involved in this case and the defendants are directed to account to the plaintiff for all damages sustained by it as a result of those infringements, together with the taxable costs of this action. Submit findings of fact and conclusions of law accordingly.