MAISON PRUNIER (a French Corporation), Plaintiff, *v.* PRUNIER'S RESTAURANT & CAFE, INC., and Others, Defendants.

Supreme Court, Special Term, New York County, May 13, 1936.

*McNamara & Seymour* [*Charles Green Smith* of counsel], for the plaintiff.

*Morris J. Junger* [*Irving Gromer* of counsel], for the defendants.

SHIENTAG, J. The motion is for a temporary injunction. The papers show that plaintiff, a French corporation, owns and operates in Paris, France, two restaurants under the name "Prunier," which specialize in sea food. The Prunier restaurant was founded by Alfred Prunier in 1872. Since then, it is asserted, the Prunier restaurants in Paris have developed international fame, both for the surpassing quality and variety of their sea food and for the distinction and extent of their clientele. They have become, it is alleged, favorite restaurants and celebrated places of interest among thousands of persons visiting Paris from America, from England and from all parts of the world.

The ownership and operation of the Prunier restaurants have descended from grandfather, through son, to grandchild, and have remained in the Prunier family. In 1914 the Prunier restaurant business took the form of a French stock company known as "Maison Prunier," and in 1922 it was taken over by plaintiff, of which Madame Simone Genevieve Barnagaud-Prunier, granddaughter of the founder, is now a managing director. Thus the good will and world wide reputation of plaintiff's restaurants have been developed and identified under the family name "Prunier."

In January, 1935, plaintiff established a branch restaurant in London, which it has conducted successfully under its own management, purveying there the same high quality and specialties in food and beverages that it furnishes to the public in its restaurants in Paris. Since the successful operation of its branch in London, plaintiff, it is further alleged, has been urged by American patrons to open a branch restaurant in the city of New York, and it has had such proposal under consideration and desires to open and operate such a restaurant in New York at an expedient time.

In July, 1935, the individual defendants adopted a scheme to utilize without permission the name and the good will of the plaintiff in the restaurant business in New York city. They filed certificates for doing business and organized two corporations, one Prunier's Restaurant & Cafe, Inc., to operate restaurants and cafes; the second corporation, organized in the fall of 1935, was called Prunier de Paris, Inc. That corporation was formed for the purpose, among other things, of buying and selling restaurants and hotels. So far as the papers show, no business has been conducted in the name of the second corporation, although its very organization speaks eloquently of the defendant's purpose not alone to use the plaintiff's name and mark in New York city, but also to attempt to identify in the public mind the restaurant here conducted with those of the plaintiff in Paris.

With an infinity of names, real and fanciful, from which to choose, the defendants appropriated to themselves the plaintiff's name. That name is not borne by the individual defendants nor is it claimed to be the name, or anything like it, of any relative of the defendants or of any officer or employee of either of the defendant corporations. Indeed, it was admitted on the argument that the name was intentionally selected because of plaintiff's well-known reputation and good will which has been built up as the result of decades of honest business effort.

The defendants deny, however, that they ever held themselves out as being Prunier's of Paris, or identified with the Paris restaurant in any way, or that they made any misrepresentations to customers or to the public to that effect. There is a conflict in the affidavits as to such oral misrepresentations to customers here. The affidavits on that point, submitted on behalf of the plaintiff, find some support in the manner in which the defendants have conducted their business from the outset. Defendants were not satisfied with taking the plaintiff's name; they also took the trademark of the plaintiff, alleged in the papers to have been registered in France, " *Tout ce qui vient de la mer.*" They printed that on their menu with the free translation," Everything that the sea produces."

Their menu displays at the top of the cover, " The Famous French Sea Food Restaurant." They also advertised themselves as " The Famous French Sea-food Restaurant," an advertisement which was calculated to give the impression that they were identified with the old restaurants bearing that name and specializing in sea food for so many years in France.

Some question is raised in the papers concerning the standards of the defendants' restaurant in this city. Their assertion to the court that they are enhancing the prestige of Prunier's is a mockery, if indeed not a gratuitous insult. Plaintiff has not intrusted its name to the defendants. Those who appropriate the name of another are hardly fit guardians for its preservation. What loyalty to this name can be expected from the defendants? They did not labor to give it the high standing it has acquired. They may abandon the name just as lightly as they took it over.

The plaintiff clearly has the right to bring an action in the courts of this State for the relief sought. Apart from the right in general of a non-resident or a foreign corporation to sue in our courts, the right of a French corporation to sue here for protection against unfair competition was expressly granted in the convention between the United States and various other powers for the protection of industrial property, as revised on June 2, 1911 (38 U. S. Stat. at Large, p. 1663). Article $10\frac{1}{2}$ reads: " All the contracting countries agree to assure to the members of the Union an effective protection against unfair competition." (*French Republic* v. *Saratoga Vichy Co.*, 191 U. S. 427; *Winthrop Chemical Co., Inc.*, v. *Blackman*, 150 Misc. 229; *Phillips* v. *Governor & Co., etc.*, 79 F. [2d] 971, 972.)

The defendants contend, however, that whatever may be said about their conduct from an ethical point of view, they are doing nothing illegal; they are acting within the law.

In approaching a consideration of the legal problems here presented, certain propositions must be kept in mind:

(1) In few branches of the law are the particular facts of a case so important as in the realm of unfair competition;

(2) There has been an increasing tendency on the part of the courts to mould, even to expand, the legal remedy in this field to conform to ethical business practice;

(3) The courts have frowned upon cases where the appropriation of the name or mark of another was intentional or in bad faith, and especially where such appropriation was accompanied by acts calculated to deceive or to defraud the public, and to convey the impression that the business of the appropriator was either the same business of the originator of the name or mark or identified with it in interest. " ' There is no part of the law which is more plastic

than unfair competition, and what was not reckoned an actionable wrong 25 years ago may have become such today.' 'There is no fetish in the word "competition." The invocation of equity rests more vitally upon the unfairness.' 'Many earlier dicta, probably some earlier decisions, are not now safe guides.' These vigorous judicial expressions of impatience with the old theories of trademark protection are indicative of a desire to keep abreast of and to serve the needs of modern business. They reflect a consciousness of the need for breadth and liberality in coping with the progressive ingenuity of commercial depravity. But forward strides in trademark protection are being attained by appeals to 'good conscience' and 'judicial sensibilities' rather than to strictly legal principles derived from a critical analysis of the real tort involved." (Schechter, The Rational Basis of Trademark Protection, 40 Harvard Law Review, 813.)

Courts generally have come to recognize that actual competition in a product is not essential to relief under the doctrine of unfair competition. Whatever may have been the ancient rule, it is now clearly established that the two products need not be competitive. " It was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trademark? " " However," said LEARNED HAND, J., in expressing the modern attitude, " it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." (*Yale Electric Corp.* v. *Robertson*, 26 F. [2d] 972, 973.)

Thus an injunction was granted restraining the defendant from conducting business under the name of Hudson Bay Fur Company or any colorable imitation thereof, although the defendant sold his fur products direct to the retail trade whereas the plaintiff did not, the court holding that the two products need not be competitive. (*Phillips* v. *Governor & Co., etc.*, 79 F. [2d] 971.) (See, also, *Buckspan* v. *Hudson's Bay Co.*, 22 id. 721.) The use of the name Del

Monte Brand was restrained on oleomargarine marketed by the defendant although the plaintiff never produced any oleomargarine or used its label thereon. " The injury to the appellee by the use of the Del Monte Brand by the appellant does not result from preventing sale by appellee of oleomargarine of its own, but from a representation to the public that it produces a product which it does not in fact produce and over which it has no control. Its reputation for quality is therefore placed to some extent in the hands of a corporation who owes it no allegiance and has no concern in maintaining the high reputation established by the appellee, and who may utilize that reputation to sell the public an inferior production." (*Del Monte Special Food Co.* v. *California Packing Corp.*, 34 F. [2d] 774, 775.) So in *Vogue Co.* v. *Thompson-Hudson Co.* (300 Fed. 509) an injunction was granted at the instance of the publisher of *Vogue* to restrain defendant from using the word " Vogue " as a label on hats.

In our own State the doctrine that the two products need not be competitive to entitle the proprietor of the mark to relief has received judicial sanction. " Plaintiff, however, is entitled to be protected not only from direct competition, but from any injury which might result to it from the deception of the public through the unauthorized use of its trade name, or a trade name which would lead the public to believe that it was in some way connected with plaintiff." (*Long's Hat Stores Corp.* v. *Long's Clothes, Inc.*, 224 App. Div. 497, 498.) (See, also, *Forsythe Co.* v. *Forsythe Shoe Corp.*, 234 App. Div. 355, 358; modfd., 259 N. Y. 248.)

It is true that in the two cases just cited it was found that the plaintiffs either formed an intent to engage in the line of business which the defendants had commenced or had at one time actually been so engaged and contemplated re-entering the business. That, however, was not the basis of the decisions. Any doubt on that score was removed in *Tiffany & Co.* v. *Tiffany Productions, Inc.*, where the Court of Appeals affirmed a judgment in favor of the plaintiff conducting a jewelry business in New York, and elsewhere, restraining the defendant from using the word " Tiffany " in advertising motion pictures. The injunction was upheld notwithstanding a vigorous dissent by two justices of the Appellate Division, based upon the proposition that " there is no possibility or at any rate no reasonable probability of any present or prospective business competition between them [plaintiff and defendant]." (147 Misc. 679; 237 App. Div. 801; 262 N. Y. 482.) (See, also, *Finchley, Inc.*, v. *Finchly Co.*, 40 F. [2d] 736; *Macy & Co.* v. *Macys, Inc.*, 39 id. 186.)

It is true that in practically all the cases cited both parties were doing business in the same localities, although in different lines of endeavor. The defendants contend, however, that the plaintiff has no right to protection against the use of a trade-mark or trade name beyond the territory in which it operates.

The law on this subject, as Nims points out, " is in a most unsatisfactory state." (Nims Unfair Competition [3d ed. 1929], p. 568.) To paraphrase a forceful judicial expression, it may be suggested whether in these days of rapid and constant intercommunication between States and nations any narrow lines of demarcation should be established on one side of which should stand moral wrong with legal liability and upon the other moral wrong with legal immunity. (*Kathreiner's Malzkaffee Fab.* v. *Pastor Kneipp Med. Co.*, 82 Fed. 321, 326.)

Be that as it may, however, some of the cases, with important reservations which will later be mentioned, tend to support the proposition of law contended for by the defendants. And this applies not alone as between two countries, but to different States or different sections of the same country, or even, under certain conditions, different localities in the same State. (*Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403; *United Drug Co.* v. *Rectanus Co.*, 248 id. 90; *Forsythe Co.* v. *Forsythe Shoe Corp.*, 259 N. Y. 248.)

The doctrine, however, is not without its limitations.

*First.* The original holder of the mark may be entitled to a natural field of legitimate trade expansion, although the cases are not very definite on this point and indicate that some user, however slight, is necessary in the disputed territory (Handler and Pickett, Trade-Marks and Trade Names, [1930] 30 Columbia Law Review, 168, 759, at p. 764; *Sweet Sixteen Co.* v. *Sweet " 16 " Shop*, 15 F. [2d] 920; *Western Oil Refining Co.* v. *Jones*, 27 id. 205.)   (See, also, *Grant* v. *Levitt*, [1901] 18 Rep. Pat. Cas. 361 [Ireland].)   The protection may be extended to the market in which the meaning of the original mark has become known.   " We are not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case." (*Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 415, 420.   Cf. *Terminal Barber Shops* v. *Zoberg*, 28 F. [2d] 807; *Western Auto Supply Co.* v. *Western Auto Supply Co.*, 13 F. Supp. 525.)

*Second.* The doctrine, it has been clearly suggested, does not apply where the second adopter is guilty of bad faith or where the use is made in such manner as to operate as a fraud upon the public.   In the *Hanover Star Milling Case* (*supra*), where an

injunction against use in another market was denied, the United States Supreme Court indicated that the fraudulent use by the junior appropriator would not be permitted. "Where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like" (p. 415). In the decision of the Circuit Court of Appeals in that case it was specifically held: "If the junior has not established his trade in good faith, or if, having appropriated certain markets in an honest belief, he should attempt to forestall the elder trader by hastening into markets the elder was arranging to occupy, it might be that equity would have no difficulty in recognizing an inchoate right in the elder to precedence and dominance, for honesty and fair dealing should always be a strong appeal to conscience; but no such questions are here, because on the present record defendant's honesty and fairness stand unquestionable." (*Hanover Star Milling Co.* v. *Allen & Wheeler Co.*, 208 Fed. 513, 522.)

The good faith of the junior appropriator was again emphasized by the Supreme Court of the United States in a later case. "Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. [Citing cases.] But the reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those of his competitor. The reason for the rule does not extend to a case where the same trade-mark happens to be employed simultaneously by two manufacturers in different markets separate and remote from each other, so that the mark means one thing in one market, an entirely different thing in another. It would be a perversion of the rule of priority to give it such an application in our broadly extended country that an innocent party who had in good faith employed a trade-mark in one State, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good-will, at the instance of one who theretofore had employed the same mark but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader." (*United Drug Co.* v. *Rectanus Co.*, 248 U. S. 90, 100.)

The plaintiff contends that its reputation extends far beyond the territorial limits of Paris and London and that it has a substantial following in New York city and in other parts of the world. If the plaintiff as the result of its efforts has become well known in New York city, the facts may be shown at a trial. The deliberate appropriation of the name " Prunier " is some evidence at least of plaintiff's wide repute. (Cf. *Hiram Walker & Sons* v. *Penn-Maryland Corp.*, 79 F. [2d] 836; *Mark Realty Corp.* v. *Hirsch*, 180 App. Div. 549.)

There is presented in this case a situation in which, it is urged, the court should set its face against a conception of business standards indefensible from an ethical viewpoint and amounting to an aggravated form of commercial piracy. The wise and expedient procedure, from the standpoint of the plaintiff itself, would be to defer the granting of the full relief sought until the trial, after both sides have had an ample opportunity to submit their proofs.

There has been some delay in making this application. To await an early trial will not under the circumstances cause irreparable injury to the plaintiff. It will eliminate the necessity for filing a bond in a substantial sum. It will result in a definite finding with respect to charges of affirmative acts of misrepresentation, an important element in the case, concerning which the affidavits are in conflict.

Some measure of relief, however, plaintiff is entitled to receive immediately. The application will, therefore, be disposed of as follows: The motion for an injunction *pendente lite* will be granted for the full relief sought, unless defendants will stipulate to proceed to an immediate trial. If such stipulation be made, the defendants will be enjoined pending the trial of the action, (a) from conducting any restaurant business in New York city under the name of Prunier de Paris, Inc.; (b) from representing verbally or in writing that it is in any way connected or identified with the restaurants conducted by plaintiff in Europe; (c) from using in any way the trade-mark of plaintiff, " *Tout ce qui vient de la mer*," or any translation thereof; (d) from employing on its menu, or its cards, or in its advertising, or in any other manner, words, phrases or trade-marks calculated to emphasize the similarity of names of the plaintiff and defendant companies in such a way as to suggest to the public an identity of origin or management.

Upon the stipulation of the defendants and the payment by plaintiff of the prescribed fees, the clerk will be directed to place the cause for trial at the head of the calendar of Special Term, Part III, for May 25, 1936, or such other date as may be agreeable to the plaintiff. Bond $250. Settle order.