Samuel H. Hofstadter, J.
There is submitted to me for approval a certificate of incorporation of a membership corporation under the name of “ New York Braves Baseball Club, Inc.” Among the stated purposes of the proposed corporation is “ to stimulate interest in the American institution known as ‘ baseball ’ among boys between the ages of 13 to 20 years ” and to inculcate in them various traits making for good citizenship. It may be poetic justice that disapproval of this proposed certificate should issue from the Bronx County Courthouse. This stately edifice crowns the Grand Concourse promontory and looks down on the Yankee Stadium — The House Which The Babe Built — where Don Larsen, in 1957, pitched the only no-hit, no-run game in World Series history.
The stated purposes are all most commendable and deserve the encouragement of the court and the community. Indeed, the certificate correctly calls baseball an American institution, for it has become much more than a mere athletic sport. It dates as far back as the middle of the 19th century, and we are told that during the Civil War baseball was popular with the Union soldiers. Professional baseball came into being somewhat later and has grown to immense proportions, so that there are now major and minor leagues and other leagues of one kind or another in all parts of the country. The World Series has become an annual event of major importance which literally keeps a large part of our population in suspense until its final outcome. Yet, this concern with professional baseball is nothing as compared to the part baseball plays in the life of the American boy and girl — for girls now play the game too. The names of yesterday’s heroes of the diamond, such as Rogers Hornsby, Christy Mathewson, Babe Ruth, Lou Gehrig are more familiar to some of our youth than historic characters. They recall the exploits of Joe Di Maggio, Hank Greenberg and other notable players of more recent years and carry in their heads the records of the current stars, Willie Mays, Hank Aaron and Ted Williams with an accuracy of memory their elders might perhaps prefer to see applied elsewhere. The feats of the outstanding players stir their imagination and perhaps breed the hope that they too may some day shine in the baseball firmament. Above all, par- • ticipation in the game not alone provides healthful exercise but its competitive element should develop a spirit of fair play. Baseball is thus a definitely salutary influence in the building of character and any effort to spread this influence should be supported, the more so when we bear in mind that a wholesome outlet for youthful energy i's a potent -safeguard against moral *135 lapse. The court is, therefore, completely sympathetic to the objectives of the proposed corporation.
But does it need the name is promoters have chosen to attain those objectives? Why, of all available names, did they have to hit upon a combination of “ New York ” and “ Braves ”? New Yorkers undoubtedly bemoan the fate which has taken from their midst and removed to the West Coast their old-time Giants and Dodgers and left the largest city in the country with a single ball team, the Yankees. Possibly the proposed name is intended to voice the grief of the incorporators that the city is in this plight and to contribute their mite towards the alleviation of the misfortune. If so, they have made a serious mistake, for they must be reminded that the Yankees are still here and that the Yankees are truly a New York baseball club. Self-evidently, the proposed name leads to confusion.
Even more objectionable is the inclusion of the name “ Braves This is an honored name in baseball. It belongs to the sturdy team which formerly hailed from Boston and now has its home grounds in Milwaukee. The team has, of course, fared better in the immediate past since its franchise was transferred to Milwaukee by winning several National League pennants and also being victorious in a World Series. However, whatever their season-end standing and whether their home was Boston or Milwaukee, the players proudly bore the name “ Braves ”. They still are the Braves and though it is hoped that any team fostered by this proposed corporation will always act bravely, it must content itself to do so without the use of the proper name ‘ ‘ Braves ’ ’.
It is now well established that a name is an inseparable part of the enterprise to which it is attached and its wrongful appropriation will not be permitted. Even when the parties are not in direct competition nor even in the same field of endeavor, the principle obtains that one may not wrongfully use another’s name (Tecla Corp. v. Salon Tecla, 249 N. Y. 157; Tiffany & Co. v. Tiffany Prods., 147 Misc. 679, affd. 237 App. Div. 801, affd. 262 N. Y. 482). Nor is the fact that they are located in different parts of the country a bar to the court’s protection.
In Maison Prunier v. Prunier Restaurant & Cafe (159 Misc. 551) the court stated that the rule “ applies not alone as between two countries, but to different States or different sections of the same country, or even, under certain conditions, different localities in the same State. (Hanover Star Milling Co. v. Metcalf, 240 U. S. 403; United Drug Co. v. Theodore Rectanus Co., 248 id. 90; Forsythe Co. v. Forsythe Shoe Co., 259 N. Y. 248.) ” *136 And in the recent case of Vaudable v. Montmartre, Inc. (20 Misc 2d 757) the principle was reiterated and a New York restaurant was enjoined from using a name made famous by its French counterpart. In the Federal courts, too, injunctions have been granted when the parties were in New York and California (Stork Restaurant v. Sahati, 166 F. 2d 348); when they were in Chicago and New York (Ambassador East v. Shelton Corners, 120 F. Supp. 551) and when they were in New York and Philadelphia (Stork Restaurant v. Marcus, 36 F. Supp. 90).
If the courts are so assiduous in protecting a name in business, how much more solicitious it must be in sports — especially with regard to the great American game of baseball- — to protect the image built up in the public mind. Certainly, at this time when baseball is in a state of transition, when teams are moving from city to city, when there is talk of a third league which will open new territory for the major leagues, the court must extend its protective arm to the sport and cannot be limited by geographic considerations. With the continuous turnover in personnel, the flux in home territory, a team’s sobriquet is its chief claim to identity. It should be guarded.
Hence, apart from the fact that there are substantial financial investments in baseball — perhaps it has become too commercialized — which would bring it within the traditional protection accorded to business enterprises, I would hold, even in the absence of precedent, that a fair name in sports is deserving and entitled to the same protective concern of the law as a good name in business or commerce.
The law’s solicitude for fair dealing and preventing the misappropriation of another’s good name protects that of the Milwaukee Braves — though this is not an adversary proceeding. Because that famous team is not a petitioner here — it could not be, for it does not know of this application — the court itself must on its own motion intervene to stay the exploitation of its hard-won distinction in baseball.
It must do so, notwithstanding that some of those whose interest in the great American sport is primarily financial have not always dealt kindly with its fans, nor even with its players, who make the sport possible. The commercial exploitation of the game has been a source of grief to many. According to Ancient Wisdom, the Holy of Holies in the Sanctuary wept when a marital union was sundered. To have removed from the Garden Borough of Brooklyn, where famous trees grow, to the far shore of the Pacific, -a winner of World Series games, was an act almost of desecration. Such “ man’s inhumanity to man makes countless thousands mourn ’ ’. Did Dickens anticipate the unholy *137 liegira when he referred to “ The Artful Dodger [s] ” and “ the dodgerest of all the dodgers ’ ’ ?
I would embrace the affirmation of the religious, the philosophers and the poets, that man’s crowning glory is a good name: Like wisdom, it is to be preferred to riches and it is better than precious ointment. It is not but air with buoyancy enough to float upon the sea of fame, nor a commodity to be bought or borrowed- — -what is not natively one’s own falls off and comes to nothing. A great name without merit is like an epitaph.
And it is quite natural that youngsters 1 ‘ charmed with the whistling of a name ’ ’ should surrender to the fascination of its magic. The Pythagoreans changed names with each other to share the virtues they saw in each other. But we may not encourage teenagers ‘ ‘ to play in the shadow of a mighty name they must win their own that it may “ not be born to die but to win a lasting fame ’ ’. There may be no Village Hampden, nor mute inglorious Milton among the intended beneficiaries of the proposed named membership corporation; doubtless, however, there is a budding Babe Ruth among them. But he must win his place on the diamond under the aegis of a name which has justly earned its place in the sun.
The aims of the corporation are laudable in every way and do not need the prop of a grandiose name for their achievement. If these aims are striven for in sincerity, the resultant accomplishment will reflect honor on any other name it assumes. The court will gladly approve the certificate under any name free of the present objections. The present certificate cannot be approved.