**HOT SHOPPES, INC., and Wendover Properties, Inc., Plaintiffs,**

v.

**The HOT SHOPPE, INCORPORATED, Richard G. Apple, Howard S. Apple, Herbert T. Apple, t/a Hot Shoppe, John Tevas, t/a Hot Shoppe, W. W. Ledbetter, and Odessa Ledbetter, t/a Dixie Hot Shoppe, John Angel, t/a Dixie Hot Shoppe, Defendants,**

and

**Gus G. Pauls, Helen G. Pauls and Colonial Fixtures Manufacturing Company, Additional Defendants.**

**No. C–128–G–57.**

United States District Court
M. D. North Carolina,
Greensboro Division.

March 28, 1962.

Francis C. Browne, Washington, D. C., and Armistead W. Sapp, Greensboro, N. C., for plaintiffs.

Stedman H. Hines, Greensboro, N. C., and Arthur O. Cooke, Greensboro, N. C., for defendants.

L. RICHARDSON PREYER, District Judge.

This is a case in which a corporation doing business across a wide section of the eastern seaboard expands into an area where a local firm is using a similar trade name. The national user—the plaintiff in this case—seeks to bar the local user from using the name.[1] The local user contends that it is the prior user in the locality and is entitled to concurrent use of the name under an appropriate equitable decree.

Plaintiff began operations under the trade name "Hot Shoppes" in Washington, D.C. in 1927. In 1934 the business was extended to an operation in Philadelphia. Operations began in Virginia in 1937; in Florida in 1945; in New Jersey in 1946; in Georgia and Illinois in 1947; in Maryland in 1952; and in Ohio, Colorado, and Texas in 1956. Plaintiff opened the operation in question in this case in Greensboro, North Carolina, in 1957. (It had registered the trade-mark "Hot Shoppes" in North Carolina April 4, 1947.)

The defendants' operation of a dinette known as "The Hot Shoppe" began in Greensboro in July of 1951. The evidence indicates that the dinette under the same name but different ownership was in operation as early as May of 1948. The defendants contend that this use prior to 1951 was a use in privity with defendants. This point becomes important when we consider the bearing of the Lanham Act on the case.

■ ■ Plaintiff first registered the trade-mark "Hot Shoppes" under the Lanham Act in February, 1951. It first

1. The words "local user" and "defendants" as used in this opinion refer only to 'Richard G. Apple, Howard S. Apple, Herbert T. Apple, t/a Hot Shoppe." Consent judgments have been entered as to all other defendants named in the caption.

registered the service mark "Hot Shoppes" in February, 1950. Registration under the Lanham Act constitutes constructive notice of ownership, and a second user cannot claim that he adopted and used the mark in good faith and without knowledge of the prior use. Defendant concedes that so long as a mark remains on the principal register, everyone is charged with notice of a claim of ownership, and no rights may be claimed in the mark by another who commenced to use it after the registration issued. Commentary on the Lanham Trade-Mark Act, Daphne Robert, 15 U.S.C.A. pp. 265, 280. But use of such a mark commenced prior to the registration date of a trade-mark may, however, be a concurrent lawful use. 15 U.S.C.A. § 1115(b) (5). Defendants contend that the latter is the situation in this case. They argue that since the defendants' business, under the name "Hot Shoppe", commenced operation (even though prior to its acquisition by the present defendants) prior to the date of issuance of plaintiff's registrations under the Lanham Act, the rights which the plaintiff might otherwise have are not available to it in this action, and that the case resolves itself into a question under the law of unfair competition and the respective rights of the parties without regard to the registration under the Lanham Act.

Section 1115(b) (5) of the Lanham Act on which defendant relies provides:

"(b) If the right to use the registered mark has become incontestable under section 1065 of this title, the certificate shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

\*     \*     \*     \*     \*     \*

"(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to the publication of the registered mark under subsection (a) or (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved."

Plaintiff contends that this provision of the Lanham Act is not applicable because defendants' use of the name was not in "privity" with defendants' predecessor. They also deny that defendants' use of the name was innocent and "without knowledge of the registrant's prior use."

### PRIOR USE IN THE LOCAL AREA BY LOCAL USER

The business and financial history of the local "Hot Shoppe" followed a tortuous course until 1951 when the present defendants took it over and turned it into a successful operation. The earlier history of defendants' operation indicates that on March 3, 1947, a corporate charter was granted by the State of North Carolina to a corporation named "The Hot Shoppe, Inc." The steps by which the dinette in question came to be opened as "The Hot Shoppe" in May, 1948, are set out in the Findings of Fact and will not be repeated in detail here. It is sufficient for present purposes to say that the corporation permitted the use of its name as a trade name by those who originated the restaurant operation. We do not think it important to determine whether the corporation was properly organized as a technical matter, or whether it could or did validly grant the right to the dinette to use the name "Hot Shoppe" when it opened in 1948.[2] In the circumstances of this case, acts are more important than documents. The

---

2. The corporation, "The Hot Shoppe, Inc.," never operated any restaurants but purported to authorize several different restaurants to use the name, although the corporation itself continued to retain the name "The Hot Shoppe, Inc." The corporation was in the business of building, leasing, and equipping restaurants.

operative fact is that the local dinette, using the trade name "Hot Shoppe," was opened for business in May of 1948. Tax stamps, city licenses, state licenses as well as testimony of witnesses indicate that the business was so known and operated prior to the acquisition of the business by the defendants in 1951. Although the business changed hands, the name continued to go with it. The original sign, "Hot Shoppe," placed on it in 1948 is on it today.

The business was managed during 1949, 1950, and part of 1951 by one John Tevas. In July, 1951, the business was shut down, apparently for financial reasons. Defendants purchased it July 16, 1951. Plaintiff contends that there can be no effective privity of defendants with prior users unless the connection is with a vital going business to which the name "Hot Shoppe" was attached. Plaintiff argues that all good will ceased when Tevas went bankrupt and the business closed down; that the defendants acquired only fixtures and property, not a going business; and that there was nothing "live," amounting to good will, until 1951 when the defendants took over and developed it—at a time when plaintiff's registration under the Lanham Act was effective.

■ It is fundamental to trade name law that there be a going business and existing good will. Was there either in 1951; and if so, were they transferred to the defendants? The evidence indicates that the business was closed down for approximately one week only in July, that the name was not changed nor any sign removed. There was some usable food still on the premises when the defendants began operation. "It looked like he had walked out for the night." Defendants spent three hundred dollars to reopen—for some painting and floor tile; they used the same equipment. Defend-

ants continued to furnish the same customers with the same general type of service given by Tevas. We do not think such a break in the chain would prevent defendants from being in privity with the earlier operators of the business. We find, therefore, that the name "Hot Shoppe" has been continuously used by defendants or those in privity with them from a date prior to the publication of the plaintiff's registration of the name under the Lanham Act.

■ ■ Further, we find that defendants' use (and the use by those in privity with them) was adopted without knowledge of the registrant's prior use.

■ As to this point, plaintiff contends at the outset that defendants had constructive knowledge of plaintiff's prior use because of the registration of the trade-mark "Hot Shoppes" filed with the Secretary of State of North Carolina on April 14, 1947, pursuant to General Statutes of North Carolina, Chapter 80.[3] The North Carolina registration statute, however, deals with trade-marks and service marks and not trade *names*. The registration may have been effective to reserve "Hot Shoppes" as a trade-*mark* or service mark to the plaintiff but was ineffective, at least under the facts of this case, to serve as constructive notice of the trade name "Hot Shoppes." While the question is not involved in this case, in the interest of clarity we emphasize that the defendants do not now, and will not have in the future, the right to use the words "Hot Shoppe" or "Hot Shoppes" as a trade-mark as distinguished from a trade name.

■ But there is a more substantial reason than the tenuous distinction between trade-marks and trade names why the North Carolina trade-mark registration is not good constructive notice: The law seems clear that state registration does not warrant any presumption of

3. This registration was filed approximately one month after the granting of the corporate charter mentioned above to the North Carolina corporation, "The Hot Shoppe, Inc." We do not think it necessary to determine whether the corpo-

rate registration had priority over the trade-mark registration, or vice versa. Use, and not the priority of incorporation or registration of the trade-mark, is the decisive factor in these circumstances.

ownership or validity of the registered trade-mark. State registration affirms the common law and does not change it; state registration does not enlarge trade-mark rights without actual use of the mark within the state. Callman, supra, p. 2089. "Apart from some small evidentiary advantages, the value of state registration is, as a rule, confined to the possibility of criminal prosecution where penalties or fines are provided." Callman, supra, p. 2090.

Plaintiff further contends that defendants had actual knowledge of plaintiff's prior use of the name, even if there is no constructive knowledge. This merges into the problem of "secondary meaning."

### ACTUAL NOTICE AND SECONDARY MEANING

The evidence indicates that defendants themselves never heard of the plaintiff's chain of eating places until about one week before plaintiff began its Greensboro operation in 1957. None of the defendants had been to Washington until about two years ago; they "knew of no 'Hot Shoppes' up the road." They were informed of no objection to the use of the name until suit was filed in 1958. As to those with whom defendants claim they are in privity, the evidence indicates that the originator, Mr. Pauls, of the North Carolina Corporation, chartered as "The Hot Shoppe, Inc.," had passed through Washington only once in his life—at night, and saw no "Hot Shoppes" signs—and had no knowledge of plaintiff's chain of stores until about 1951. The words "Hot Shoppe" or "Hot Shoppes" are not strikingly unusual or fanciful, and it does not tax credulity to imagine one hitting upon the name as an original thought, or in the manner suggested by Pauls—(from seeing an adjacent sign reading "Hat Shoppe"). That defendants lacked actual knowledge of plaintiff's use of the name is reinforced by the fact that there is no showing that the defendants attempted to cash in on plaintiff's good name, or to reap where they have not sown. They appear innocent of any intention to palm themselves off as the plaintiff or to use plaintiff's good will. In fact, the defendants exhibit a stubborn pride in their own achievement, pointing out that their "Sanitation Rating" is higher than plaintiff's, remarking on the loyalty of their clientele and the extensive nature of their advertising—and give the impression that they consider plaintiff fortunate to be confused with them.

But plaintiff contends that even though defendants or those in privity with them had never seen one of plaintiff's operations, that plaintiff's name "Hot Shoppe" had acquired a "secondary meaning" in Greensboro as early as 1937. It is well settled that long use in connection with the business of the particular trade may cause a name, composed of words which are descriptive, to come to be understood by the public as designating the business of a particular trader. This is the doctrine of "secondary meaning." This doctrine "establishes, entirely apart from any trade-mark act, the common law right * * * to be free from the competitive use of these words as a trade-mark." Callman, "Unfair Competition and Trade-Marks," 1225. Callman further states, at page 1237, that "Secondary meaning must have been evident at the time of the use which determines priority. Whether or not a mark has acquired secondary meaning is a question of fact for the court and not a proper subject for expert testimony. The burden of proof rests with the plaintiff. A high degree of proof is necessary to establish secondary meaning in a descriptive term * * * [but] a presumption in favor of secondary meaning stems out of a long and exclusive use of a trade-mark."

We must look, then, to the period 1948 to determine whether plaintiff's use of "Hot Shoppe" had acquired a secondary meaning at that time in the Greensboro, North Carolina area. The question is whether on the key date in 1948, when those in privity with defendants began operations, plaintiff's name had a secondary meaning or established general repu-

tation. In determining whether the plaintiff's mark has acquired a secondary meaning, it is appropriate to consider (1) the length and manner of use of the name or mark in question, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts toward promoting a conscious connection in the public mind between that name or mark and a particular product. Time, Inc. v. Life Television Corp., 123 F.Supp. 470 (D.C.Minn.1954).

■ The evidence indicates that for approximately seventeen years preceding the institution of this action, there was some use of the words "Hot Shoppe," either alone or in conjunction with other words, to designate restaurant businesses (usually small in size) owned and operated by persons totally disassociated with plaintiff. Several of these uses were in the Greensboro area. "The fact that a word has been used or registered by many others argues very forcibly against secondary meaning for the same word in favor of one." Callman, supra, 1238.

Prior to 1949 plaintiff was rapidly expanding its operations, but these operations were confined largely to the Washington area or to the area north of Washington. The evidence shows that prior to 1949, plaintiff operated nine (9) drive-in restaurants in Washington, D.C.; five (5) drive-in restaurants in Arlington, Virginia, which is adjacent to Washington, D.C.; two (2) drive-in restaurants in Philadelphia, Pennsylvania; and one (1) in New York State. Plaintiff also furnished catering services for industrial and airline feeding, one of the airlines being operated into Greensboro, with "Hot Shoppes" printed on the sugar packets. Plaintiff contends that it has utilized virtually all media for advertising its trade-mark and trade name "Hot Shoppes," including newspaper, radio, television, street car and bus placards, menus, billboard, caps etc. It argues that it has had a "Hot Shoppe" restaurant on U.S. Highway #1 since 1935, and that all traffic from the south passed it prior to 1948 when a new bridge was built. It contends that in 1948 billboards were located on the various main highways leading to the South, from Philadelphia to south of Richmond. Plaintiff offered evidence that numerous personnel from North Carolina were employed by the company from its beginning, and that by word of mouth and means of this advertising, the name "Hot Shoppes," was favorably know in this area in 1948 and that it connoted plaintiff's national operation. But plaintiff conducted no direct advertising in the local area of Greensboro—or in North Carolina—prior to 1957. It can point to nothing other than word of mouth notice to the local area.

Defendants have offered a number of witnesses who testified that to them "Hot Shoppe" did not mean a chain of restaurants. Admittedly it is difficult to prove public reaction by such testimony, but it has some weight when considered with the fact that no witnesses, apart from plaintiff's employees, testified that it did have such a secondary meaning. Perhaps of more weight is the fact that 85% of defendants' customers are regular customers and not transient ones: the name did not appear well enough known to attract many travelers in the area.

We cannot say that plaintiff has carried the burden of proof of establishing a secondary meaning in the local area prior to 1949.

■ The essence of secondary meaning is popularity and public acceptance of the mark. Secondary meaning can create no rights beyond the area of popularity. "Universality of recognition is not required. What is required is that a substantial section of the purchasing public should be proved to identify the trade name of the plaintiff's goods, and that this should be true of the district in which the defendant's trade is done." Callman, supra, p. 1240. In the present case, plaintiff's trade name and trademark had concededly obtained secondary meaning in certain localities in 1949, but we think not in the locality in which defendants' operated. Many of the cases relied on by plaintiff are largely distinguished from the present case by this

fact: i. e. the cases cited by plaintiff are situations where the reputation zone of the name or mark is nationwide. e. g. Stork Restaurant, Inc. v. Sahati, 9 Cir., 1948, 166 F.2d 348; Brass Rail Inc. v. Ye Brass Rail of Massachusetts, Inc., D. C.Mass.1938, 43 F.Supp. 671; Maison Prunier v. Prunier's Restaurant & Cafe, Inc., Sup.Ct.1936, 159 Misc. 551, 288 N.Y.S. 529; Ambassador East, Inc. v. Orsatti, Inc., 3 Cir., 257 F.2d 79. We think that the cases cited by plaintiff are further distinguished from the present case because of the element of unfair competition present in them; the name was selected "with some design inimical to the interest of the plaintiff." Safeway Stores, Inc. v. Sklar, 75 F.Supp. 98 (D.C.E.D.Pa.1947). In the instant case there is no evidence that defendants have attempted to trade off of plaintiff's reputation. Also, the cases cited by plaintiff deal with more unique or "stronger" marks than "Hot Shoppes." Of course, the history of trade reveals many examples of weak marks being built into extremely valuable trade symbols. That appears to be happening—or to have already happened—with plaintiff's use of "Hot Shoppes." We do not, however, think that plaintiff had acquired such universal recognition in 1949. The development of secondary meaning is ordinarily the result of a gradual and steady growth and is not manufactured overnight.

We think the case of Federal Glass Co. v. Loshin, D.C., 126 F.Supp. 737, is in point. In that case the plaintiff contended it held a national reputation having been incorporated in 1900. The defendant operated a small business in Connecticut beginning in the year 1925. The Court stated:

"However, one of the principal elements of the requisite deception of the public is proof of an established reputation by the plaintiff at the time the defendant first uses the name or a similar name. * * *

"Without some showing of a sec-ondary meaning or general reputation in reference to the use of a certain name in a specific area, no inference of fraudulent intent on the defendants' part may be drawn, nor, if the finding of fraudulent intent is deemed unnecessary, is it possible to assert any likely deception to the public."

The plaintiff, in the Loshin case, failed to show that in 1925 it had an established reputation with the general public of the Danbury, Connecticut area. The Court indicated that this limitation of plaintiff's reputation was a fatal blow to its case. Catalogues, which plaintiff sought to use as indicative of its reputation, were shown to be for the sole use of distributors. See also Fairway Foods, Inc. v. Fairway Markets, Inc., 9 Cir., 227 F.2d 193, and Chayt v. Darling Retail Shops Corp., D.C., 175 F.Supp. 462.

Subsequent to 1949, plaintiff expanded spectacularly: Its total sales in 1947 were 8½–9 million,[4] while its sales in 1960 were fifty-eight million dollars. In 1949 there were 17 operations; in 1961 there were 101. In 1949, plaintiff's operations were more limited in scope, both geographically and financially.

■■■ We find that plaintiff's name had not acquired a secondary meaning in the local area in 1949 so as to bar defendants from the use of the name.

### LACHES

Defendants also contend that plaintiff has lost any rights it might otherwise have because of the equitable doctrine of laches. While an answer to this question is not required because of the conclusion reached above, we discuss it in the interest of avoiding unnecessary appeals.

In March 1948, plaintiff caused a letter to be written to the "Hot Shoppe" at West Market Street in Greensboro which stated, "inter alia," that: "we have been instructed to institute action to prevent the further use of its (plaintiff's) name in violation of our client's right, but before doing so will be glad to

---

4. I find no figures for the year 1948–9.

discuss the proposed action and the disposition with you or your legal representative." The defendants neither saw nor heard of this letter before this suit was instituted. No further action was taken pursuant to this letter until this suit was instituted in 1958.

[18] This letter was written prior to issuance of any registration by plaintiff of its trade-marks or service-marks under the Lanham Act. The controversy, if plaintiff had seen fit to follow through with the suit which its attorneys had been "instructed" to institute, would have revolved around the effect of its registration under the North Carolina law as opposed to the prior issuance of the corporate charter to the Hot Shoppe, Inc. "Secondary meaning" would have been of paramount importance if such action had been brought. Apparently, plaintiff elected not to "test" its position in 1948, but rather waited until it had carried on a substantial expansion program.

In 1954, the defendants added on a small side dining room to their establishment. This expansion occurred before plaintiff opened its Greensboro operation,[5] and was undertaken without knowledge of plaintiff's claim made in its letter of 1948. Plaintiff suffered this expansion to be undertaken without taking any action.

We think that the plaintiff has lost by laches any rights they might otherwise have had against defendants. Chayt v. Darling Retail Shops Corp., supra. It may be that laches is no bar in a case where unfair competition is found to exist. Stork Restaurant, Inc. v. Sahati, 9 Cir., 166 F.2d 348. But as mentioned above at page 782, that is not the situation here.

Plaintiff's operations are very substantial. Plaintiff is understandably concerned over the possible dilution of its trade-mark and trade name. In this connection, we point out that the only possibility of a concurrent use, such as that allowed in this case, lies in another situation falling within the exception provided in the Lanham Act in section 1115(b) (5). It would seem that few if any operations now exist which could show local use of the name prior to 1950, the date of plaintiff's registration under the Lanham Act. Furthermore, defendants concede that they are only entitled to use the name "Hot Shoppe" in the local area of Greensboro and do not seek—nor would they be entitled to—the use of the name in any other area of North Carolina.

## CONCLUSION

The evidence in this case indicates some confusion exists insofar as mail delivery and telephone calls are concerned. Practically no confusion exists in respect to the restaurant operations *per se*. (The defendants' operation is essentially a "dinette," while the plaintiff's is a restaurant and drive-in business bearing little physical resemblance to defendants' business. One of plaintiff's witnesses testified that defendants' sign "looks like one of ours 25 years ago." Plaintiff's evidence also indicates that it has never conducted a "dinette" type of operation. Also, defendants' operation is a 24 hour business, seven days a week; plaintiff keeps hours that are normal to the general drive-in and restaurant business.) Under the law, and in equity, each party to the action is entitled to continue to use the words "Hot Shoppe" or "Hot Shoppes" provided such name is used in a manner to minimize the likelihood of confusion between plaintiff's and defendants' operation.

To that end an appropriate decree will issue. The details of such a decree—involving the designation of each operation for use in display and radio and TV advertising, and telephone directory listing etc.—may best be left to the parties for settlement. The parties are therefore given 90 days from the date of this opinion in which to present a proposed decree. If they are unable to agree on the terms of such a decree, the court will proceed to its formulation.

5. Defendants added a back dining room in 1959, after the suit was brought.